# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-DP-00213-SCT

*STEPHEN VIRGIL McGILBERRY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/1996 |
| TRIAL JUDGE: | HON. JAMES W. BACKSTROM |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID MICHAEL ISHEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | DALE HARKEY |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY-DIRECT APPEAL |
| DISPOSITION: | AFFIRMED 06/03/1999 |
| MOTION FOR REHEARING FILED: | 6/18/99; denied 09/16/99 |
| MANDATE ISSUED: | 09/23/99 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Appellant Stephen Virgil McGilberry ("McGilberry") was charged with murdering four members of his family. A Jackson County Grand Jury indicted him on four counts of capital murder while engaged in the commission of a robbery. Trial was held in the Circuit Court of Jackson County, Circuit Judge James W. Backstrom presiding. The jury returned a guilty verdict on the four counts of capital murder and, on February 9, 1996, after hearing arguments in aggravation and mitigation, imposed a sentence of death on all four counts. McGilberry appeals to this Court and assigns 18 issues for review. With the addition of our statutorily mandated review of the proportionality of the death sentence, the following 19 issues are before us:

> **I. The Jackson County Sheriff's Office did not have probable cause to arrest the Appellant on the morning of October 24, 1994, and therefore any information obtained from the Appellant was fruit of a poisonous tree and was therefore inadmissible.**
>
> **II. The trial court erred in denying the Appellant's motion to suppress the Appellant's**

confession as a violation of his Fifth and Sixth Amendment rights of the United States Constitution as well as Article 3, § 23 of the Mississippi Constitution.

III. The trial court erred in allowing a video tape recording of the crime scene into evidence which contained redundant footage and had no value.

IV. The trial court erred in overruling the Defendant's motion for mistrial based on the district attorney's comment on the Defendant's failure to testify.

V. The trial court erred in overruling the Appellant's motion for mistrial based on the prosecution's vilifying of the Appellant in closing argument.

VI. The trial court erred in overruling the Defendant's motion to dismiss the capital portion of the indictment and proceed with the crime of "simple" murder.

VII. The trial court erred in allowing the State to solicit commitments from potential jurors during voir dire.

VIII. The trial court erred in overruling the Defendant's two motions for mistrial due to the district attorney's remarks and the remarks made by the expert witness that if the Defendant was found not guilty by reason of insanity, he would be released.

IX. The trial court erred in denying the Defendant's motion to exclude testimony about the money order for child support as well as the Defendant's motion to exclude the money order from evidence.

X. The trial court erred in overruling the Defendant's motion to dismiss this indictment due to pretrial statements made by the Jackson County Sheriff's office.

XI. The trial court erred in denying the Defendant's motion ex parte for psychological evaluation and forcing the Defendant to have his motion heard in open court.

XII. The trial court erred in allowing the testimony of Dr. Henry Maggio as to the competency of the Defendant to stand trial.

XIII. The trial court erred in denying the Appellant's request for a twelve hour cooling off period between the guilt and sentencing phase of the trial.

XIV. The trial court erred in denying the Defendant's motion for a new trial based on the conduct of the prosecuting attorneys.

XV. The trial court erred in denying the Defendant's motion to transport the Defendant to his attorney's office for confidential consultation.

XVI. The trial court erred in overruling the Defendant's motion for mistrial in regard to comments made of a note not admitted into evidence nor authenticated for the purpose of trial.

XVII. The trial court erred in not giving a basis for acceptance of the State's race neutral

**reason for striking jurors after Defendant's *Batson* challenge when some of those reasons provided by the State were improper and unconstitutional in regard to religion.**

**XVIII. If any of the issues standing alone is not sufficient to create reversible error, then the cumulative effect of these issues, combined with the heightened standard of review in capital cases, creates reversible error.**

**XIX. Whether the imposition of the death penalty is disproportionate in this case to other death sentences upheld by the Court and is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 3, Section 28 of the Mississippi Constitution of 1890.**

## STATEMENT OF THE FACTS

¶2. McGilberry, who was 16 years of age at the time, lived at 7101 Dewberry Street in the St. Martin community in Jackson County, Mississippi, in the home of his stepfather and mother, Kenneth and Patricia Purifoy. McGilberry's half-sister, Kimberly Self, and her son, Kristopher Self, also lived in the Purifoy home.

¶3. McGilberry and Meyer Shawn Ashley ("Ashley") initially planned only to steal his half sister's green GEO Storm and sell it for cash or drugs in New Orleans. One week prior to the murders, McGilberry approached Ashley about killing his family. Ashley withdrew from the plot the Friday night before the murders when "things didn't sound right." On Saturday, McGilberry then discussed the murders with Chris Johnson ("Johnson"), who was 14 years of age. That Saturday night, McGilberry had a dream in which he visualized killing his parents. It was after this dream that he went down the street to Johnson's house where the plan to murder his family evolved.

¶4. McGilberry and Johnson returned to McGilberry's residence sometime around 10:30 a.m. on Sunday morning, October 23, 1994. They originally considered slitting his parents' throats with a utility knife which police later found under a box in the attic of the Purifoy's home. This changed when they realized that it would be impossible to cut their throats because of the way Kenneth was sleeping. McGilberry and Johnson were in the garage smoking cigarettes when Johnson picked up a baseball bat and suggested that they knock their victims unconscious. They decided to hit the victims in the head with the baseball bat, drag them into the garage, weight the bodies and dump them off the pier. Due to the fact that McGilberry's mother was awake, the two were unable to execute their plan immediately. They placed the bats outside McGilberry's bedroom window and went back inside the house.

¶5. McGilberry later told Detective Ken McClenic ("McClenic") that he had hit his stepfather and half-sister Kimberly, while Johnson had hit McGilberry's mother and three-year old nephew. McGilberry also confessed to striking his mother once on top of the head with the baseball bat because she was suffering.

¶6. On Sunday, October 23, 1994, police received a 911 call regarding a medical emergency at the Dewberry Street residence. At approximately 10:59 p.m., James D. McArthur ("McArthur"), a Jackson County Sheriff's Deputy on patrol, was instructed to investigate. Upon arrival, he found several people standing in the driveway of the residence. Michael Petranglo ("Petranglo"), later determined to be the boyfriend of one of the victims, approached McArthur and said "I think they're dead." Confused, and still thinking that this was only a medical emergency, McArthur secured Petranglo in the back of his patrol car.

McArthur entered the house through the front door and eventually found the bodies of four persons.

¶7. Found dead inside the house were: Kenneth Purifoy ("Kenneth"), a 44 year-old technical sergeant at Keesler Air Force Base; his wife, 44 year-old Patricia Purifoy ("Patricia"); her daughter, 24 year-old Kimberly Self ("Kimberly"); and Kimberly's 3 year-old son, Kristopher Self ("Kris"). From Petranglo, who was Kimberly's boyfriend, police learned that there was a fifth family member, McGilberry, whose whereabouts were unknown.

¶8. After committing the murders, McGilberry and Johnson drove Kimberly's GEO Storm to some friends' house in Vancleave, Mississippi, where the two spent the night at the home of Mrs. Brenda Smith Saucier ("Brenda"), the friends' mother. Upon learning that something was wrong at the Purifoy home, Brenda drove McGilberry and Johnson back to the scene the morning after the murders.

¶9. McGilberry and Johnson were taken by officers to the Jackson County Sheriff's Office in Pascagoula. The pair were subsequently transported to the Criminal Investigation Department, also located in Pascagoula. After McGilberry was read his *Miranda* rights, he signed a waiver form and indicated that he understood his rights.

¶10. The first part of the initial interview between McClenic, the chief investigator on the case, and McGilberry was not recorded. Thereafter, McClenic videotaped the remaining parts of the interview with McGilberry. On videotape, McGilberry confessed to bludgeoning his family to death and also to taking cash, a money order, a credit card, and Patricia's drivers license after the murders had taken place.

¶11. It appears that McGilberry had been disciplined by his parents for skipping school and for losing his job. Particularly disturbing to McGilberry was the fact that his privilege of driving the family Bronco had been taken away, and he was embarrassed for his friends to see his mother driving him to school.

¶12. While being interviewed, McGilberry told police where to find the murder weapons and other pertinent evidence. McGilberry was charged, indicted, convicted and sentenced to death on four counts of capital murder. He timely perfected his direct appeal to this Court.

## DISCUSSION OF THE LAW

**I. The Jackson County Sheriff's Office did not have probable cause to arrest the Appellant on the morning of October 24, 1994, and therefore any information obtained from the Appellant was fruit of a poisonous tree and was therefore inadmissible.**

¶13. The State begins by asserting that this assignment of error is procedurally barred because McGilberry never raised this issue in the lower court. McGilberry argues that he "specifically retained his right to join in all motions filed on behalf of the co-defendant, Chris Johnson, by the Jackson County Public Defender's Office." This motion was granted by the trial judge without objection from the State. The record before this Court, however, is void of any such motion that may have been filed by Johnson. Simply put, we have no way of knowing whether Johnson ever filed a motion alleging lack of probable cause. It is clear that McGilberry himself never raised the lack of probable cause as a basis for suppressing his confession.

¶14. Regardless, McGilberry's contention that he was illegally arrested is without merit. At the time McGilberry gave his confession, he was not under arrest. He was only a suspect brought in for questioning. Furthermore, McGilberry was sought for questioning because police had learned that he was the only

surviving family member, he was missing and Petranglo had told police to look for McGilberry because Kimberly's GEO Storm was not at the Dewberry residence and McGilberry's Bronco was there. This issue is without merit.

### II. The trial court erred in denying the Appellant's motion to suppress the Appellant's confession as a violation of his Fifth and Sixth Amendment rights of the United States Constitution as well as Article 3, § 23 of the Mississippi Constitution.

¶15. McGilberry asserts that his confession was obtained in violation of his Fifth and Sixth Amendment rights, as well as his rights under the Mississippi Constitution. After a lengthy hearing, the trial court denied McGilberry's motion to suppress his statement. The State correctly points out that an order overruling the motion is not contained in the record, nor did the trial judge make detailed findings of fact on the record.

¶16. Without detailed findings of fact, we are at a disadvantage. The trial court is in a much better position to make findings of fact than is an appellate court viewing only a cold record. *Gavin v. State*, 473 So. 2d 952, 955 (Miss. 1985). In this case, however, the record contains the waiver of rights, initialed and signed by McGilberry, and the videotape wherein McGilberry states that he understands his rights and waives them. Defense counsel extensively questioned the three officers concerning the voluntariness of the confession at the suppression hearing. There is nothing in the record to indicate that McGilberry's confession was anything other than voluntary.

¶17. Briefly, we address McGilberry's claim that his Sixth Amendment right to counsel was violated. Federal law is clear that the Sixth Amendment right to counsel does not attach until the first adversarial judicial proceeding involving the defendant is begun. *United States v. Gouveia*, 467 U.S. 180, 187 (1984). Under the Mississippi Constitution, the "right to counsel 'attaches once the proceedings reach the accusatory stage.' " *Johnson v. State*, 631 So. 2d 185, 187-88 (Miss.1994) (citation omitted). The right to counsel, at both the federal and state level, attaches at the point in time when the initial appearance under Rule 1.04 of the Uniform Rules ought to have been held. *Morgan v. State*, 681 So. 2d 82, 90 (Miss.1996). Like the Fifth Amendment right to counsel, a defendant's Sixth Amendment rights are not violated by questioning in the absence of his attorney unless the defendant has asserted his right to have an attorney present. *Wilcher v. State*, 697 So. 2d 1087, 1096 (Miss.1997).

¶18. There is no of evidence suggesting that McGilberry asserted his right to counsel during the questioning. At the point his confession was obtained, McGilberry was a suspect who had been brought in for questioning. There was no violation of his Sixth Amendment right to counsel.

¶19. McGilberry is left with only a Fifth Amendment challenge to the admissibility of his confession. Given that he had knowingly, voluntarily and intelligently waived his rights, McGilberry's challenge rests on the allegation of police misconduct. Specifically, McGilberry argues that his confession is inadmissible due to the refusal of law enforcement officers to allow Ross Simons ("Simons"), the Jackson County Public Defender, an opportunity to speak with the defendant.[1]

¶20. Once McGilberry arrived at the murder scene, Jackson County Sheriff's Deputies took him to the Sheriff's Department located in Pascagoula, approximately 20-30 minutes away. Shortly thereafter, he was transported to the Criminal Investigation Department, also in Pascagoula. Deputy McClenic began interviewing McGilberry about 11:55 a.m., approximately three hours after his arrival.

¶21. During the interview, Simons arrived at the Criminal Investigation Division. Simons testified that he told the police officers that he "came down there to see the child that they were questioning about this capital murder case." Simons also gave one of the officers a business card which had written on the back "10/24/94 - 12:05. Antonio, your attorneys are here." Simons represented a client named Antonio McGilberry, not the same person as the defendant herein. The officers refused to give the card to McGilberry or to allow Simons to speak with him. At this point, Simons was under the impression that it was Antonio McGilberry whom the police were questioning. He later expanded his testimony to say that he was there to see the child or children that were charged with the four counts of capital murder which he read about in the newspaper that morning. He further testified that no one, including McGilberry, had called him or asked him to represent McGilberry. The United States Supreme Court has held that events, such as those set out above, which occur outside the presence and knowledge of a defendant, "can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran v. Burbine*, 475 U.S. 412, 422 (1986). The Constitution has never been interpreted to require that law enforcement provide a suspect with a "flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id*. "[E]ven deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." *Id*. at 423.

¶22. The Court explicitly stated that the *Moran* decision did nothing to prevent the states from adopting their own requirements as a matter of state law. *Id*. at 428. As McGilberry argues in his brief, many states have accepted the Court's invitation and have declined to follow *Moran*. Mississippi, however, has not departed from the reasoning of *Moran*.

¶23. Most recently, we have approvingly cited *Moran* for the proposition that, even though a lawyer had been retained by family members, it was of no consequence because the defendant was unaware of the efforts of the family or the lawyer. *Hunt v. State*, 687 So. 2d 1184, 1160 (Miss. 1996). We addressed a similar situation in *Lee v. State*, 631 So. 2d 824 (Miss. 1994). There, the defendant's sister made a statement to the effect that **she** was going to obtain a lawyer to represent the defendant. *Id*. at 826. Lee contended that the statements emanating from his sister were sufficient to trigger his right to counsel and preclude any subsequent waiver of his rights. *Id*. The *Lee* Court began by noting that under *Moran* "attempts by others to procure counsel are not sufficient to invoke the Fifth Amendment right to counsel where the defendant is unaware of such attempts." *Id*. The Court then placed Mississippi squarely within the parameters of *Moran* on state law grounds. "A rule allowing third parties to invoke individual constitutional rights is not required by federal case law nor was such announced in *Reuben* or any other Mississippi case." *Id*. at 827. "[S]uch a rule would be contrary to the clear implication of both federal and state cases." *Id*.

¶24. It is not asserted that McGilberry sought to terminate the interview or exercise any of his rights, including the right to counsel. According to Simons's testimony, he went to the Criminal Investigation Division looking for Antonio McGilberry. He later explained to the trial court that he was there to see the person charged with four counts of capital murder. That he was looking for Antonio McGilberry is of no consequence. Nowhere does Mississippi law, statutory, judicial, or otherwise, require law enforcement personnel to cease with a lawful interview and re-advise the defendant that he has the right to a lawyer or inform him that there is a lawyer outside, where the defendant himself has not requested or otherwise indicated that he wished to speak with an attorney before further questioning.

¶25. For the foregoing reasons, McGilberry's arguments on this issue are without merit. In Mississippi, the

right to counsel must be invoked by the defendant and not by third parties acting outside the knowledge of the defendant.

### III. The trial court erred in allowing a videotape recording of the crime scene into evidence which contained redundant footage and had no value.

¶26. The Jackson County Sheriff's Office made a videotape which depicted the crime scene and the victims. The video, which began outside the home, consisted of a walk-through of the entire house. The body of each victim was shown just as the police had found them. Various points of blood spatter and/or smears, as well as other items such as Kimberly's purse, were shown to the jury through the use of the videotape. McGilberry complains that any probative value of the videotape was outweighed by its prejudicial effect and that the tape contained redundant evidence.

¶27. The admissibility of photographs rests within the sound discretion of the trial judge. *Blue v. State*, 674 So. 2d 1184, 1210 (Miss. 1996)(*quoting Cabello v. State*, 471 So. 2d 332, 341 (Miss. 1985)). The trial judge's decision will not be disturbed absent a showing of an abuse of discretion. *Herring v. State*, 374 So. 2d 784, 789 (Miss. 1979). "Such discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987); *see also Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995) and *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994).

¶28. In addition to M.R.E. 403,[2] the court must also consider "(1) whether the proof is absolute or in doubt as to the identity of the guilty party, and (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." *Blue*, 674 So. 2d at 1210 (*citing McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989)).

¶29. Further, photographs have evidentiary value when they: "1) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and cause of death; 3) where they supplement or clarify witness testimony." *Westbrook*, 658 So. 2d at 849 (citations omitted). The same standard of admissibility which applies to photographs also applies to videotapes. *Holland v. State*, 587 So. 2d 848, 864 (Miss. 1991).

¶30. There is no question that the videotape of the Purifoy residence is prejudicial to McGilberry's case, but it also contained probative value. It accurately depicted the location of the bodies and the scene at the crime. The tape assisted Officer McClenic and Dr. Stephen McGibbon with their respective testimony. It also identified the victims for the jury, showed the effect on the victims from the blows delivered with the baseball bats, corroborated various aspects of McGilberry's confession and aided the prosecution in identifying him as the guilty party. Moreover, the video was instrumental in helping the jury visualize the bloody crime scene, the victims' injuries and the force necessary to inflict them. It also showed blood smears on the wall, which created the impression that someone had attempted to clean up the crime scene. Finally, the video aided the jury in determining the heinous, atrocious, and cruel nature of the crime. Although photographs of the crime scene were admitted which depicted essentially the same evidence, the video's probative value still substantially outweighed any unfair prejudicial effect on the defendant. The mere fact that the video was somewhat cumulative does not extinguish its probative value. *Tubbs v. State*, 402 So. 2d 830, 836 (Miss. 1981). We find that the trial judge acted within his broad discretion in allowing the jury to view the videotape.

**IV. The trial court erred in overruling the Defendant's motion for a mistrial based on the district attorney's comment on the Defendant's failure to testify.**

¶31. McGilberry assigns the following as an impermissible comment by the prosecution during closing argument on McGilberry's failure to testify:

Mr. Harkey: The State of Mississippi is blamed, though, for putting this evidence in front of you. The only people who have picked up a photograph in closing to inflame you has been the defendant, his representatives. We haven't. All of this evidence is here. You want to know why we have fingerprints, DNA, bloodstains pattern interpretation, blood analysis from serologists? Why? Stephen McGilberry pled not guilty. And he doesn't have to do a thing. He sits there. We have to prove the case.

McGilberry's objection was overruled, but the trial judge allowed him the right to make a record later. His motion for a mistrial based on the above comments was subsequently denied by the trial judge.

¶32. McGilberry's privilege against self-incrimination is guaranteed to him by the Fifth and Fourteenth Amendments to the United States Constitution and by Art. 3, § 26 of the Mississippi Constitution of 1890. The standard of review for denial of a motion for a mistrial is abuse of discretion. *Gossett*, 660 So. 2d at 1290-91.

¶33. A direct comment on a defendant's failure to testify is not allowed under Mississippi law and constitutes reversible error. *Davis v. State*, 660 So. 2d 1228, 1254 (Miss. 1995)(*citing Butler v. State*, 608 So. 2d 314, 318 (Miss. 1992)) and *Livingston v. State*, 525 So. 2d 1300, 1305-08 (Miss. 1988). Reference to a defendant's failure to testify by innuendo and insinuation is also forbidden. *Davis*, 660 So. 2d at 1254 (*citing Wilson v. State*, 433 So. 2d 1142, 1146 (Miss. 1983)).

¶34. Balanced against the rights of the defendant, however, is the rule that lawyers are given broad latitude in their closing arguments. *Davis*, 660 So. 2d at 1254 (*citing Johnson*, 477 So. 2d 209). Thus, although a direct comment on the defendant's right to testify is forbidden, all other comments must be examined on a case-by-case basis. *Davis*, 660 So. 2d at 1254 (*citing Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988)).

¶35. There is a distinction between a comment on the failure to testify and a comment on the failure to put on a successful defense. *Jimpson*, 532 So. 2d at 991. "[N]ot every comment regarding the lack of any defense or upon the defense presented is equivalent to a comment on the defendant's failure to testify . . . Moreover the State is entitled to comment on the lack of any defense, and such a comment will not be construed as a reference to a defendant's failure to testify by 'innuendo and insinuation.'" *Shook v. State*, 552 So. 2d 841, 851 (Miss. 1989).

¶36. During closing arguments, McGilberry accused the State of prolonging the trial by putting forth unnecessary or redundant evidence and attempted to place the blame for his crimes on those who failed to obtain proper treatment for him. Viewing the District Attorney's arguments in context, it is clear that he was responding to the arguments made by the defense. He was seeking to explain that it was the State who bore the burden of proof and that it was not incumbent upon the defense to prove anything to the jury. Moreover, the jury was given several instructions which clarify any confusion resulting from the arguments. Jury instruction C-1 stated in relevant parts:

The evidence which you are to consider consists of the testimony and statements of witnesses and the

exhibits offered and received. You are permitted to draw such reasonable inferences from the evidence as seem justified in the light of your own experience.

Arguments, statements, and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. If any argument, statement, or remark has no basis in the evidence, then you should disregard that argument, statement, or remark.

Jury instruction C-17 stated as follows:

The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving the defendant guilty of ever material element of the crime which he is charged. Before you can return a verdict of guilty, the State must prove to your satisfaction, beyond a reasonable doubt that the defendant is guilty. The presumption of innocence attends the defendant and prevails, unless overcome by evidence which satisfies the Jury of his guilt beyond a reasonable doubt. The defendant is not required to prove his innocence.

¶37. It is presumed that jurors obey and follow the instructions given to them by the trial court. ***Blue v. State***, 674 So. 2d 1184, 1213 (Miss. 1996); ***Johnson v. Fargo***, 604 So. 2d 306, 311 (Miss. 1992). In ***Blue***, the Court was faced with a similar situation when the prosecutor remarked, "This Defendant . . . has sat through this entire trial smiling." ***Blue***, 674 So. 2d at 1213. The Court first found that the statement was an impermissible comment on the accused's failure to testify. ***Id***. at 1214. However, the error was not reversible because the instructions given to the jury "effectively eradicated" any effect the comment may have had on the jury's decision.[(3)] ***Id***. at 1215. Additionally, here the trial judge instructed the jury that closing arguments were not to be taken as evidence and that they were to make their decision from the evidence and the law. Thus, it was explicit to the jury that comments made by counsel in closing were not to be taken as evidence. It is impossible to conceive that, if this one isolated remark had not been made, the result would have been different. The State offered overwhelming evidence of McGilberry's guilt. In fact, McGilberry's only defense was that of insanity, not that he did not commit the crimes. We are confident that the comment by the prosecutor did not result in a violation of McGilberry's fundamental rights or deprive him of a fair trial. Nor did it prejudice the jury against him.

> **V. The trial court erred in overruling the Defendant's motion for mistrial based on the prosecution's vilifying of the Appellant in closing argument.**

¶38. McGilberry points to two separate instances where the prosecution referred to him as being "bad to the bone." The first occurred during the prosecution's closing argument in the guilt phase of the trial.

Mr. Saucier: . . . I want you think through all the evidence, because you, as laypersons, very likely could say: It was so horrible, he had to be crazy. I guess he and the 14 year-old that were with him, but at least this defendant for this case. The other theory is, is among us are some people that are bad to the bone. They're not crazy. I call them sociopaths. I found out there's not a clear definition of sociopaths. But they're bad to the bone.

¶39. The second incident also occurred during the prosecution's closing argument in the guilt phase of the trial.[(4)]

Mr. Harkey: . . . Because he [Dr. Deal] thought, man, if you do this, something is seriously wrong with you. And from that idea springs all of these personality disorders and everything else that this boy

is suffering from. He's not normal. I'll give you that. He is not normal. But he's responsible. He's cold-blooded. Bad to the bone.

¶40. McGilberry contends that the above references were outside the allowable scope of closing arguments and constituted an attempt by the prosecution to enrage the jury against him. The State counters on several fronts, the first being that this issue is procedurally barred because of the lack of a contemporaneous objection.

¶41. McGilberry's counsel did not object to the aforementioned references at the time that they were made. Instead, he waited until the jury had retired to deliberate before making a motion for a mistrial. In his motion for a new trial, McGilberry did assign as a point of error, "[t]he trial court erred in overruling the Defendant's Motion for a mistrial based on the District Attorney's personal attacks on the defense counsel as well as remarks made by the District Attorney's Office in the presence of the jury."

¶42. This Court has previously disapproved of the procedure followed by McGilberry's counsel at trial.

> We next observe it is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment. See: *Wilson v. State*, 234 So. 2d 303 (Miss.1970) at 308; *Aldridge v. State*, 180 Miss. 452, 177 So. 765 (1938) at 456; *Matthews v. State*, 148 Miss. 696, 114 So. 816 (1927) at 701.

> Defense counsel chose not to follow this familiar path, but to wait until the conclusion of the argument to object. This is quite illogical and extreme, and places the state in a "Catch 22" situation. To allow defense counsel to argue at conclusion of argument, to which no objection has been made, he is then entitled to a mistrial is not only inviting error, but also preventing the trial judge from taking the one step he could have taken to remove the possibility of prejudice. We cannot countenance assigned errors based on this sort of a proceeding.

*Johnson v. State*, 477 So. 2d 196, 209-10 (Miss. 1985); *see also Smith v. State*, 724 So. 2d 280, 302 (Miss.1998); *Davis v. State*, 660 So. 2d 1228, 1250 (Miss. 1995); *Monk v. State*, 532 So. 2d 592, 600 (Miss. 1988).[(5)] "This rule's applicability is not diminished in a capital case." *Chase v. State*, 645 So. 2d 829, 835 (Miss. 1994)(*quoting Cole v. State*, 525 So. 2d 365, 369 (Miss.1987).

¶43. By failing to lodge a contemporaneous objection, McGilberry denied the trial judge the opportunity to cure any error that occurred as a result of the comments made by the prosecutor. Notwithstanding the procedural bar, this Court also, alternatively, looks to the merits of the underlying claim knowing that any subsequent review will stand on the bar alone.

¶44. Lawyers on both sides are generally given wide latitude during closing arguments. *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992); *Neal v. State*, 451 So. 2d 743, 762 (Miss. 1984); *Bullock v. State*, 391 So. 2d 601, 610 (Miss. 1981). This Court has explained that not only should the State and defense counsel be given wide latitude in their arguments to the jury, but the court should also be very careful in

limiting free play of ideas, imagery, and personalities of counsel in their argument to jury. *Ahmad*, 603 So. 2d at 843. *See also Johnson*, 477 So. 2d at 210. Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comments must be considered in context, considering the circumstances of the case, when deciding on their propriety. *United States v. Bright*, 630 F.2d 804, 825 (5th Cir. 1980); *United States v. Austin*, 585 F.2d 1271, 1279 (5th Cir. 1978). The prosecutor is also limited "to arguing facts introduced in evidence, deductions and conclusions that may be reasonably draw[sic] therefrom, and application of law to facts." *Holland v. State*, 705 So. 2d 307, 343 (Miss. 1997)(*citing Ivy v. State*, 589 So. 2d 1263, 1266 (Miss. 1991)).

¶45. McGilberry argues that the prosecutor went outside the permissible bounds by referring to him as "bad to the bone." He cites *Bridgeforth v. State*, 498 So. 2d 796 (Miss. 1986) and *McFee v. State*, 511 So. 2d 130 (Miss. 1987) as support for his argument.

¶46. In *Bridgeforth*, the prosecutor stated: "If I thought I could stand on my head and that would convince you to get this scum off the street, I'd do it." *Bridgeforth*, 511 So. 2d at 801. The Court stated that there is "no justification for such argument." *Id*. "[A] prosecutor should not indulge in personal abuse or vilification of the defendant." *Id*.

¶47. In *McFee*, the prosecutor characterized the defendant as "animalistic."[(6)] *McFee*, 511 So. 2d at 135. Again, the Court noted that it was impermissible for the prosecutor to abuse or vilify the defendant. *Id*. The Court also pointed out that it is improper for the prosecutor to appeal to the passion or prejudice of the jury. *Id*.

¶48. Returning to the case at bar, the first incident is not within the genre of personal attacks or instances of vilification that the Court has forbidden in the past. Mr. Saucier's comment was made in the course of describing sociopaths. He was attempting to distinguish between a sociopath who could be found not guilty by reason of insanity and a sociopath who was criminally responsible for his actions. Given the fact that McGilberry's only defense was insanity, and taking the comment in the context in which it was made, we find that under the present circumstances, the prosecutor's description falls within the wide range of permissible arguments.

¶49. The second statement made by Mr. Harkey, however, is more troublesome and problematic. Unlike Mr. Saucier, it is apparent that Mr. Harkey was referring to McGilberry as "bad to the bone." The State argues that the Mr. Harkey was merely responding to the claims that someone else was to blame for McGilberry's problems.[(7)] At the time the prosecutor made the statement, he, like Mr. Saucier, had been arguing that McGilberry was not insane as defined by the law. Mr. Harkey referenced Dr. Deal's testimony and how McGilberry had gotten Dr. Deal to buy into the idea that McGilberry was a sociopath and should not be responsible for his crimes in an attempt to discredit the opinion of Dr. Deal. Although the second comment borders on being improper, given the circumstances and the context in which it was made, we cannot say that it is of the kind found in *Bridgeforth* which requires reversal.

¶50. Even if the comment was improper, the test used to determine if reversal is required is "whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice." *Rushing*, 711 So. 2d at 455 (*quoting Taylor v. State*, 672 So. 2d 1246, 1270 (Miss. 1996)(*citing Craft v. State*, 226 Miss. 426, 434, 84 So. 2d 531, 535 (1956)). Since the jury had seen the videotape and there was overwhelming evidence against him, we are confident that the isolated remark by Mr. Harkey did not create any unjust prejudice against

McGilberry which resulted in a verdict "influenced by prejudice."

¶51. In summary, this entire assignment of error is procedurally barred for failure to lodge a contemporaneous objection. Aside from the bar, this issue is affirmed on its merits, though the subject comment by the prosecutor is only permissible in the narrow context for what it was offered.

### VI. The trial court erred in overruling the Defendant's motion to dismiss the capital portion of the indictment and proceed with the crime of simple murder.

¶52. The State asserts that this issue is procedurally barred. McGilberry, however, preserved the issue by raising it in his motion for a directed verdict at the end of the State's case-in-chief. *See **Holland v. State***, 656 So. 2d 1192, 1197 (Miss. 1995).

¶53. McGilberry frames this issue as if the trial court committed reversible error in denying his motion to dismiss the capital portion of the indictment. However, his arguments go toward the State's lack of proof concerning robbery or more succinctly stated, he challenges the sufficiency of the evidence. The standard of review for challenging the legal sufficiency of the evidence is familiar and need not be restated here. *See **Weeks v. State***, 493 So. 2d 1280, 1282 (Miss.1986)(*citing **Gavin v. State***, 473 So. 2d 952, 956 (Miss.1985)). To violate our robbery statute, the property must have been taken against the victim's will or by violence to the victim's person. Miss. Code Ann. § 97-3-73 (1994).

¶54. The State submitted proof that the McGilberry took: 1) a GEO Storm automobile registered to Kenneth but which the testimony showed belonged to Kimberly; 2) a child support money order[8] made out to Patricia in the amount of $150; 3) $15 cash from Patricia's and Kimberly's respective purses; 4) Patricia's drivers license; and, 5) a credit card belonging to Patricia.

¶55. McGilberry contends that the GEO Storm was driven by all members of the family, thus he could not be guilty of stealing it. This argument is totally without merit for several reasons. Meyer Ashley testified that McGilberry approached him some two weeks before the murders about stealing Kimberly's car, taking it to New Orleans to sell for cash and running away to Natchez. Brenda Saucier testified that she had never seen McGilberry drive the GEO Storm until he drove it to her house the day of the murders. McGilberry also admitted to police that originally he had intended just to steal the car. Moreover, McGilberry, in his confession, said that Johnson wanted to leave immediately after committing the murders, but McGilberry told him that they had to go back in and get the stuff.

¶56. McGilberry makes no arguments concerning the cash, credit card, or drivers license[9] taken from the victims. Taking all the evidence in the light most favorable to the State, it is apparent that the State presented more than sufficient evidence to support a the jury's finding that the robbery was committed in the course of the murders. This issue is wholly without merit.

### VII. The trial court erred in allowing the State to solicit commitments from potential jurors during voir dire.

¶57. McGilberry alleges that the district attorney, Dale Harkey, was allowed to solicit commitments from potential jurors during voir dire as follows:.

> Mr. Harkey: The State of Mississippi has to prove beyond a reasonable doubt, [McGilberry did] kill and murder Kenneth Purifoy during the commission of a robbery, and Patricia, and Kimberly Self and

her son Kristopher. If we prove it to you beyond a reasonable doubt, can you return a verdict of guilty of capital murder? If we prove it to you? On the first row.

(Jurors nodded in the affirmative.)

Mr. Harkey: Second row, can you do it?

(Jurors nodded in the affirmative.)

Mr. Lawrence: I object to this, Judge. I would like to approach the bench on this matter, please.

The Court: All right.

¶58. After a lengthy bench conference, the trial judge sustained the objection and instructed counsel not to solicit commitments from jurors. However, he denied McGilberry's motion for a mistrial.

¶59. Our trial courts enjoy broad discretion in passing upon the extent and propriety of questions posed to prospective jurors. *Davis v. State*, 684 So. 2d 643, 651-52 (Miss. 1996); *Jones v. State*, 381 So. 2d 983, 990 (Miss. 1980). Abuse of discretion will only be found where McGilberry shows clear prejudice. *Davis*, 684 So. 2d at 652; *Jones* 381 So. 2d at 990. The district attorney should avoid questions which seek a commitment from a juror if the state proves certain facts. *West v. State*, 485 So. 2d 681, 686 (Miss. 1985); *Murphy v. State*, 246 So. 2d 920, 921 (Miss. 1971). The prosecution should not attempt to obtain a commitment from each juror as to what he would do under any given circumstances. *Murphy,* 246 So. 2d at 922.

¶60. While the prosecutor went beyond what is considered proper questions, the trial judge sustained the objection to the line of questioning but refused to grant the motion for a mistrial. The decision whether to grant a mistrial lies within the sound discretion of the trial judge. *Brent v. State,* 487 So. 2d 213, 214 (Miss.1986); U.C.C.C.R 3.12. McGilberry has failed to show any substantial or irreparable prejudice stemming from the improper question. This assignment of error is without merit.

> **VIII. The trial court erred in overruling the Defendant's two motions for mistrial due to the district attorney's remarks and the remarks made by the expert witness that if the Defendant was found not guilty by reason of insanity he would be released.**

¶61. During the cross-examination of McGilberry's psychiatric expert, Dr. Roy Deal[10] ("Dr. Deal"), the prosecutor made the comment that "if he's [McGilberry] declared by this jury to be insane, he can walk away." McGilberry immediately objected, and the trial judge sustained his objection. The prosecutor continued to try and speak over the judge and made the additional statement that "he won't be responsible." The trial judge admonished the jury to disregard the question completely.

¶62. Outside the presence of the jury, McGilberry made a motion for a mistrial, or, alternatively, that a curative instruction be given. The motion for a mistrial was denied, but a curative instruction was given to the jury. The trial judge gave the following instruction to the jury:

> Members of the jury, I sustained the objection to the question regarding that, if he was insane, he might walk away - not guilty by reason of insanity, he might walk away. I told you to disregard that. I want to further say that that would not be accurate, that if he was found guilty, uh, not guilty by reason

of insanity, he would go to the custody of the state hospital at Whitfield.

¶63. If an admonition or curative instruction cannot remove the prejudicial effect of an inadmissible matter placed before the jury, then a mistrial is required. *Reynolds v. State*, 585 So. 2d 753, 755 (Miss. 1991). However, the remedial action taken by the trial judge here is usually deemed sufficient to remove the taint from the minds of the jurors. *Id*. **This Court gives considerable discretion to the trial judge in determining whether a mistrial is warranted because he is "peculiarly situated to determine if a remark is truly prejudicial." *Gossett v. State*, 660 So. 2d 1285, 1290-91 (Miss. 1995). Juries are presumed to follow the instructions given to them by the court. *Chase v. State*, 645 So. 2d 829, 853 (Miss. 1994)(*quoting Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985)). The procedure employed by the trial court in the case *sub judice* effectively cured any prejudice arising from the erroneous statement by the prosecutor. There was no abuse of discretion in denying the motion for mistrial.**

**¶64. The second incident cited by McGilberry occurred during the State's examination of Dr. Maggio, the State's psychiatric expert who was called in rebuttal.**

> **Mr. Harkey: We have heard discussions, Doctor, of the antisocial personality disorder, or sociopath or - that type of description. In your words for us, please, what does that describe?**
>
> **Dr. Maggio . . . The history of people who become sociopaths is that they end up in the legal system, incarcerated in jails, or they are killed because of their behavior, or they get burned out by the time they're around 45, and they are so irritable to everybody else that nobody wants anything to do with them, and by then, they just quit their activities. But they do interphase between law and medicine and psychiatry. These are the people that are the con artists. They do these actions, and when they get apprehended, they say, "You know I'm crazy. You know I'm sick." So, the heat is off and they're put in the psychiatric hospital. As soon as the police leave, shortly thereafter, they turn to the doctor and they say, "You know I'm not sick. You know I'm not psychotic. You can't keep me in the hospital. Let me out."**

**McGilberry's objection was overruled. The next morning, outside the presence of the jury, counsel for McGilberry asked for a mistrial based on Dr. Maggio's statements.**

> **Mr. Lawrence: If your honor recalls, when Dr. Maggio was testifying yesterday, he made some statements to the effect - and this was after Mr. Harkey had indicated to the jury that if they find him guilty of insanity, he would hit the street or turn him loose or walk out in the hallway, and I don't know what he said. But Dr. Maggio took those statements to heart, apparently, while he was sitting in this courtroom and said, well, if they're found guilty of insanity, they go to a mental institution and then they just start telling the doctor they're not insane, turn me loose, turn me loose. And if I recall correctly, I think he did say it twice. And I made an objection at the time, and it was right in the middle - it was a late hour and right in the middle - it was a late hour and right in the middle - the jury was in the courtroom, and I reserved my right to make a motion for a mistrial, and I'm doing that now based on those statements to the jury. Thank you.**
>
> **The Court: All right. I'll overrule that. I believe that was covered by the previous instruction**

I gave to the jury. I'll overrule the motion. All right.

¶65. McGilberry argues that the failure of the trial judge to give another curative statement after the second incident requires reversal. The State contends that: (1) no error is present because Dr. Maggio was describing the behavior of a sociopath in the abstract, and; (2) any error was remedied by the trial judge's previous curative instruction concerning a verdict of not guilty by reason of insanity and its resulting consequences.

¶66. Reviewing Dr. Maggio's testimony, it is evident that he was describing how a sociopath could be expected to behave once caught. There is no mention of McGilberry, nor was there any speculation as to how long incarceration in a mental hospital would last. The cases cited by McGilberry are distinguishable in that they dealt with instances where the comments went directly to the length of time that the defendant himself might have to spend confined in a mental institution or prison. *See Williams v. State*, 445 So. 2d 798, 813 (Miss. 1984) and *Martin v. State*, 415 So. 2d 706, 708 (Miss. 1982).

¶67. In summary, any error that occurred as a result of the prosecutor's comment that McGilberry would "walk away" if found insane was cured by the trial court's sustaining the objection and issuing a curative instruction. A second curative instruction would have been cumulative and would serve no useful purpose, as the jury already knew McGilberry's fate if found not guilty by reason of insanity. There was no error arising from Dr. Maggio's testimony. His statements were of a generic or hypothetical nature, and, affording the trial judge his due discretion, we find that there was no abuse of such discretion. This assignment of error is without merit.

> IX. The trial court erred in denying the Defendant's motion to exclude testimony about the money order for child support as well as the Defendant's motion to exclude the money order from evidence.

¶68. McGilberry argues that since the child-support money order was for his benefit, it was solely his property. As such, he submits that none of the victims had a property interest in the money order, and it should not have been used to help the prosecution establish the underlying felony of robbery. It is elemental that the relevancy and admissibility of evidence rests largely within the discretion of the trial judge, and he will only be reversed where that discretion is abused. *See generally Underwood v. State*, 708 So. 2d 18, 31 (Miss. 1998).

¶69. McGilberry directs our attention to several domestic cases as support for his argument that the money order was his property. Collectively, those cases stand for the proposition that child support is awarded to the custodial parent for the benefit of the children. *See Thurmond v. Thurmond*, 559 So. 2d 1014, 1016-18 (Miss. 1990); *Cumberland v. Cumberland*, 564 So. 2d 839, 847 (Miss. 1990); *Alexander v. Alexander*, 494 So. 2d 365, 368 (Miss. 1986); *Trunzler v. Trunzler*, 431 So. 2d 1115, 1116 (Miss. 1983). Within those cases, we have stated that child-support benefits belong to the child. *Alexander*, 494 So. 2d at 368; *Trunzler*, 431 So. 2d at 1116. That statement, however, was made within the context of who may compel an accounting from the custodial parent receiving the benefits. *Id*.

¶70. While the benefits in question may have been for the use and benefit of McGilberry, this

Court has never said that a child can take child-support checks and put them to his unfettered use and enjoyment. Child-support payments are made to the custodial parent, who utilizes the funds to provide for the maintenance and best interest of the child. *Adams v. Adams*, 467 So. 2d 211, 215 (Miss. 1985). Put another way, though the $150 money order was to be used for McGilberry, it was up to his mother, Patricia, and not him, to determine how and when the funds would be disbursed for his use and benefit. The trial judge did not abuse his discretion in admitting the money order into evidence to allow the prosecution to show that McGilberry committed the underlying felony of robbery. This issue is without merit.

> X. The trial court erred in overruling the Defendant's motion to dismiss this indictment due to pretrial statements made by the Jackson County Sheriff's Office.

¶71. McGilberry asserts that members of the Jackson County Sheriff's Office violated U.C.C.C.R. 9.01[11] by releasing prohibited information to members of the media. Rule 9.01 concerns pretrial publicity and prohibits various officials, including law enforcement personnel, from disclosing, among other things, a defendant's prior criminal history, existence or contents of a confession or the evidence in the case. The State concedes that the newspaper articles contain statements which appear to be in violation of U.C.C.C.R. 9.01.

¶72. Such action by an agent of the State is one of the most certain ways to secure a reversal in a criminal case. *Hannah v. State*, 336 So. 2d 1317, 1323 (Miss. 1976). One of the ways for vindicating the right of an accused to a fair trial, however, is a change of venue. *Fisher v. State*, 481 So. 2d 203, 216 (Miss. 1985).

¶73. McGilberry's motion for change of venue was granted, and the case was moved to Rankin County for jury selection which would have eliminated any prejudice that may have evolved from the improper pretrial statements made to the media. McGilberry, however, filed a motion to remand back to Jackson County. The trial judge, after questioning the defendant himself, granted the request to move venue back to Jackson County.

¶74. Reviewing the voir dire portion of the trial, only one juror stated that she could not be fair based on what she knew about the case. At the change of venue hearing, the trial judge remarked that he had ordered venue changed only out of an abundance of caution. Despite the improper pretrial statements made by law enforcement officials, there is no evidence in the record suggesting that McGilberry was denied his right to a fair trial by an impartial jury. Any U.C.C.C.R. 9.01 violation was waived by McGilberry's request to move the trial back to Jackson County. Therefore, this assignment of error is also meritless.

> XI. The trial court erred in denying Defendant's motion *ex parte* for psychological evaluation and forcing the Defendant to have his motion heard in open court.

¶75. McGilberry, an indigent defendant, filed an *ex parte* motion requesting a psychological evaluation. The trial judge opted to hear the motion in open court in order to give the State an opportunity to object, but he reserved the right to enter a confidentiality order. At the hearing, defense counsel merely requested that McGilberry undergo a psychological examination either at the State Hospital at Whitfield or by a private physician. On appeal, McGilberry argues that he is prejudiced because he is indigent. He states that a defendant with the ability to pay for a

lawyer could simply have obtained the psychological evaluation without the State's knowledge and decide later whether or not to release the results to the State. He claims that he was forced to disclose a "potential defense" and "pass on private information that a criminal defendant with private funds would not have to do," which violates the fundamental precepts of *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985). The issue is not whether an indigent defendant was denied access to expert assistance, but simply whether the judge abused his discretion in refusing to hear the motion *ex parte*.

¶76. The federal cases relied on by McGilberry hold that hearings concerning an indigent's need for expert assistance and the services of an investigator must be held *ex parte*. All involve the interpretation of 18 U.S.C. § 3006(A)(e). *See e.g. United States v. Edwards*, 488 F.2d 1154 (5th Cir. 1974). This state has not seen fit to adopt this requirement either by statute or court rule. Mississippi provided for the discretionary use of independent expert assistance at the expense of the state even before *Ake*. *Harrison v. State*, 635 So. 2d 894, 900 (Miss. 1994)(other citations omitted). However, we have only addressed the issue of *ex parte* hearings in passing.

¶77. In *Manning*, the defendant asserted that he had a right to proceed *ex parte* on an application for funds for independent experts. *Manning v. State*, 726 So. 2d 1152, 1191 (Miss. 1998). However, the first motion filed by Manning was not for an *ex parte* hearing. He was examined and a report was prepared almost two months before his *ex parte* petition was filed. *Id*. Thus, the trial judge's ruling that Manning notice the State if he wished to hire an expert did not have any effect on the *ex parte* motion. *Id*. The Court went to say:

> Manning had no right to an independent mental examiner and he suffered no prejudice in not having one.[(12)] This assignment of error is meritless. We do note here, however, that the State has no role to play in the determination of the defendant's use of experts. The necessity and propriety of such assistance is a matter left entirely to the discretion of the trial court.

*Id*.

¶78. Regardless of whether McGilberry should have been allowed to proceed *ex parte* with his motion, he has not demonstrated how the lower court's decision was "prejudicial to the assurance of a fair trial" and how the court's abuse of discretion was "so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." *Harrison*, 635 So. 2d at 901 (*citing Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1988)).

¶79. McGilberry was allowed to be examined by an independent expert. He does not point to any prejudicial effect stemming from having to argue the motion in open court. His only argument is that a possible defense was revealed to the State at the hearing. McGilberry filed the *ex parte* motion for psychological exam on April 17, 1995, which was the deadline for filing pretrial motions. The motion for psychological exam was heard on May 12, 1995.

> If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, the defendant shall, within the time provided for filing pretrial motions or at such later time as the court may direct, serve upon the prosecuting attorney and the clerk of the court a written notice of the intention to offer a defense of insanity.

U.C.C.C.R. 9.07.

¶80. Thus, McGilberry's strategy would have been revealed to the State prior to trial. The purpose of the federal rule that requires the hearing to be *ex parte* is to protect the defendant from being forced to reveal his strategies and theories to the prosecutor. *United States v. Meriwether*, 486 F.2d 498, 506 (5th Cir. 1973). Moreover, the psychiatrist's report was not turned over to the State until the Friday before the trial began on Monday. McGilberry asked for, and received, expert assistance concerning his mental condition. He was not prematurely forced to reveal the results of the psychological evaluation to the State. This assignment of error is without merit.

> **XII. The trial court erred in allowing the testimony of Dr. Henry Maggio as to the competency of the Defendant to stand trial.**

¶81. The trial judge appointed Dr. Deal to examine McGilberry prior to trial. Dr. Deal testified that McGilberry "could not fully appreciate the wrongfulness of his actions or differentiate between right and wrong." The State sought to rebut this testimony with that of its own psychiatrist, Dr. Henry Maggio.

¶82. First, McGilberry asserts that the State could have had him examined by the doctors at the State Hospital in Whitfield, but failed to do so. Second, McGilberry argues that Dr. Maggio's testimony should have been excluded because he never conducted an examination of the defendant. Third, he argues that Dr. Maggio never consulted with the defense attorneys concerning McGilberry's competency, which he asserts is in contradiction to the established recommendations of the profession of psychiatry. Fourth, he submits that since the State failed to have the doctors at Whitfield examine him, the State was left with only two choices: (1) ask for a continuance and seek another evaluation, or (2) concede that McGilberry was insane and seek commitment to a mental hospital. Finally, McGilberry alleges that he was "ambushed" by the State's choice to hire an outside expert and present his testimony at trial. For the reasons set forth below, all of McGilberry's contentions on this issue are without merit.

¶83. First, the State argues that this issue should be procedurally barred. The State presented the testimony of Dr. Maggio as a response to the declaration by Dr. Deal that McGilberry was unable to distinguish right from wrong. As Dr. Maggio's testimony was offered in rebuttal, the State argues that it was not required to disclose or otherwise notify the defense of its intention to rebut the defense evidence. *See* U.C.C.C.R. 9.04(A)(1). The State's argument is unpersuasive.

¶84. We have effectively dispatched the "rebuttal witness" ruse for non-disclosure of witnesses in the context of criminal cases. *Emil v. The Mississippi Bar*, 690 So. 2d 301, 317 (Miss. 1997); *Coates v. State*, 495 So. 2d 464, 466 (Miss.1986); *Johnson v. State*, 491 So. 2d 834, 836-37 (Miss.1986); *Tolbert v. State*, 441 So. 2d 1374, 1375 (Miss.1983). In an effort to eliminate finally the time-honored practice of "trial by ambush," this Court has championed the practice of full disclosure by the State's district attorneys. It bears reiterating that, unless a party is truly surprised by a witness's testimony, the better, and required practice, is one of full disclosure of all witnesses. The failure of the State to disclose Dr. Maggio as a possible witness, however, is harmless under the circumstances.

¶85. During a hearing outside the presence of the jury, the State notified the defense and the court of its intention to have Dr. Maggio listen to the testimony and of the possibility of his rebuttal testimony. McGilberry objected, claiming that he had not received notice of Dr. Maggio. The State countered that it had only received the defense notice of insanity the Friday before trial began on Monday. Later, counsel for McGilberry complained to the court that Dr. Maggio refused to speak with him concerning his opinion on McGilberry's competency. The court directed the district attorney to ask Dr. Maggio to be forthright with the defense with respect to his prospective testimony. Dr. Maggio was accepted by the defense as an expert in the field of pyschiatry. There is nothing further in the record concerning the defense's inability to ascertain the opinions of Dr. Maggio.

¶86. We have outlined the procedure to be followed when a trial court is faced with a possible discovery violation by the State. *Ramos v. State*, 710 So. 2d 380, 385 (Miss. 1998)(*quoting Cole v. State*, 525 So. 2d 365 (Miss.1987)). *See also West v. State*, 553 So. 2d 8, 18 (Miss.1989). Although McGilberry objected to Dr. Maggio's being called as a witness, the State was ordered to make the doctor available to the defense. There is no mention in the record of a defense request for a continuance after speaking with Dr. Maggio. We must assume that McGilberry's counsel was satisfied with the response from Dr. Maggio and chose to proceed with trial rather than request a continuance. Absent a request for a continuance, we are unwilling to hold the trial court in error where it was not given an opportunity to make a ruling. *Fleming v. State*, 604 So. 2d 280, 293 (Miss. 1992). When told that the State would direct Dr. Maggio to be forthright with him, defense counsel responded, "Thank you. That's all I request." McGilberry's argument that the State committed a discovery violation, while technically correct, is unfounded due to the discussions of the defense and the propounding of Dr. Deal's report on the eve of trial.

¶87. Additionally, there is no merit to McGilberry's claim that Dr. Maggio was required to examine personally the defendant and/or speak with defense counsel. An expert's opinion may be based on facts or data "made known to him at or before the hearing." M.R.E. 703. Furthermore, his opinion may be based on the testimony of others which he heard while sitting in the courtroom. *Id*. Likewise, Mississippi's case law supports the position that an expert may base his opinion solely on the testimony of others he has witnessed. *See Collins v. State*, 361 So. 2d 333, 334 (Miss. 1978)(expert witness may remain in courtroom and base his testimony upon the prior testimony of other witnesses). This method is particularly useful in criminal cases. *Id*.

¶88. The question of whether a person is qualified to testify as an expert is committed to the sound discretion of the trial court. *Cooper v. State*, 639 So. 2d 1320, 1325 (Miss.1994). Absent a showing that such discretion has been abused and the witness is clearly not qualified, the decision of the trial court will not be reversed on appeal. *Id*. McGilberry did accept Dr. Maggio as an expert in his field. Thus, there was no abuse of discretion in allowing Dr. Maggio to rebut the testimony of Dr. Deal, as there is no requirement that an expert personally examine the defendant in order to give an opinion as to his sanity. This entire assignment of error is without merit.

    **XIII. The trial court erred in denying the Appellant's request for a twelve hour cooling off period between the guilt and sentencing phase of the trial.**

¶89. McGilberry submits that the trial court erred in not granting his motion for a 12 hour cooling off period between the guilt and sentencing phases. The jury brought the guilty verdict in at 12:46 p.m., and the judge allowed a 15 minute recess before beginning the sentencing phase of the trial. The judge, in denying the motion, noted that it was the middle of the day, the jury had already eaten lunch, and he did not see any reason for a cooling off period.

¶90. Mississippi's statutory scheme concerning the guilt and sentencing phases of a capital murder trial provides only that "[t]he proceeding shall be conducted by the trial judge before the trial jury as soon as practicable." Miss. Code Ann. § 99-19-101(1) (1994). Ordinarily, trial judges have broad discretion in determining how long trials last on any given day. *Edge v. State*, 393 So. 2d 1337, 1342 (Miss. 1981). In utilizing this discretion, trial judges should keep in mind the mental and physical toll that litigation takes on the lawyers involved and the defendant's right to effective assistance of counsel. *Id.*

¶91. In the case at bar, there is no evidence to suggest that the trial judge abused his discretion. McGilberry's counsel did not assert that he needed a longer break in order to adequately prepare for the sentencing portion of the trial. The hour was not late, nor were there any complaints from the jury. This claim is without merit.

> XIV. The trial court erred in denying the Defendant's motion for a new trial based on the conduct of the prosecuting attorneys.

¶92. McGilberry alleges that he is entitled to a new trial based on the conduct of the prosecutors throughout the trial. In addition to the claims raised in issues IV, V, VII, and VIII, he points to six different instances within this issue. We examine each of these instances individually.

> (1) Continuing to question witnesses after an objection was made but before the trial judge made a ruling.

¶93. First, McGilberry contends that reversible error occurred when the prosecutor continued to ask leading questions during the direct examination of Deputy McArthur. The State correctly points out that the prosecutor was attempting to get to the relevant portion of the witness's testimony. Any error that occurred in this innocuous exchange was cured by the trial judge's sustaining the objection. *See Holland v. State*, 705 So. 2d 307, 335 (Miss. 1997).

¶94. In the second exchange cited by McGilberry, the trial judge asked the prosecutor to rephrase his question, and subsequently sustained the objection. There was no attempt by the prosecutor to continue the questioning after the objection, he was merely responding to a question from the court. This allegation is totally without merit.

¶95. The third exchange occurred when Mr. Harkey was attempting to show inconsistencies between other evidence and the testimony offered by Dr. Roy Deal. The State argues that the prosecution had a right to bring out the inconsistencies between Dr. Deal's testimony and the other evidence. McGilberry admitted that the original plan was to slit the victims' throats, but they could not because of the way Kenneth was sleeping, rather than he did not "want to see so much blood" as stated by Dr. Deal.

¶96. Even assuming *arguendo* that the prosecutor continued the questioning without

acknowledging the objection, there is no error. The jury was instructed that "arguments, statements, and remarks of counsel . . . are not evidence. If [it] has no basis in the evidence, then you should disregard [it]." Juries are presumed to follow the instructions given by the court. *Davis*, 660 So. 2d at 1249 (*citing Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992)). This portion of McGilberry's claim is without merit.

¶97. Finally, McGilberry points to Harkey's cross-examination of Dr. Deal. McGilberry objected to a question on the grounds that it was "asked and answered." Mr. Harkey replied, "not yet." The trial judge overruled the objection and instructed the witness that he could answer. Once again, Mr. Harkey's comment was not a question to the witness but, rather his response to the defense objection.

¶98. McGilberry's claims within this sub-issue are without merit. We have found no incident of error, either reversible or cumulative.

    **(2) Repeated leading of witnesses.**

¶99. McGilberry points to three occasions where the prosecutor was leading witnesses. On all three occasions, McGilberry objected, and the trial judge sustained the objections. Given the trial judge's discretion in this area and that the objections were sustained, we find no error within this sub-issue. *Holland*, 705 So. 2d at 335; *Whitlock v. State*, 419 So. 2d 200, 203 (Miss. 1982).

    **(3) Commenting on the testimony and giving declaratory statements.**

¶100. McGilberry cites six instances where the conduct of the prosecutor should have afforded him a new trial. We address each individually.

¶101. The first involved the prosecutor's objection to a question posed by Mr. Ishee, McGilberry's attorney. Mr. Harkey stated, "Excuse me, Judge. He's asked about five questions in one." The judge sustained the objection and instructed defense counsel to ask the questions one at a time. Although the prosecutor failed to state the word "objection," he clearly has a right to object to multiple questions. There is no error here.

¶102. McGilberry's last five complaints within this sub-issue all stem from Mr. Harkey's cross-examination of Dr. Deal. In the first, Mr. Harkey, after receiving a lengthy answer from Dr. Deal, replied "Well goodness gracious, Doctor. How can -." At which point an objection was made and sustained. McGilberry's counsel accused the prosecutor of throwing a tantrum in the courtroom. There is nothing in the record to support the assertion of the prosecutor throwing a tantrum. The trial judge simply sustained the objection and said, "Ask your questions."

¶103. McGilberry objected to the prosecutor's question "And, boy, if anybody had, you know? "[13] The trial judge sustained the objection and instructed the prosecutor not to make comments. This cured any possible error. *See Holland, supra*.

¶104. Later, Dr. Deal, in response to a question, stated that he did not know if Patricia and McGilberry's biological father were married. Mr. Harkey stated that "they weren't," and McGilberry immediately objected to the prosecutor's testifying. Once again, the trial judge sustained the objection, thus curing any possible error.

¶105. The final incident within this issue occurred when Mr. Harkey commented that if McGilberry was found insane he could walk away. This erroneous statement of law, fully considered above in issue XIII, was decided adversely to McGilberry and need not be discussed again.

(4) Making derogatory comments about defense counsel.

¶106. McGilberry asserts that the prosecution team made two derogatory comments about defense counsel. The first occurred while Mr. Ishee was conducting a direct examination of Officer McClenic.

[Mr. Ishee]

Q. So, you could have been mistaken about what I asked you, couldn't you?

Mr. Harkey: Come on. Judge.

Mr. Ishee: I'll move on, Your Honor.

The Court: Well, do you have an objection to that?

Mr. Harkey: Yes, I do. I have an objection to that.

The Court: Sustained. All right. You have to object and then I'll rule. All right? "Come on, Judge," is not an objection.

Mr. Harkey: I understand that.

¶107. We do not see any derogatory comment toward defense counsel in the above exchange. Yes, Mr. Harkey should have said "objection" and then stated his grounds. The trial judge, however, intervened, admonished the prosecutor to make his objections properly, and eventually sustained the objection. The second incident occurred outside the presence of the jury, thus there is no prejudice to McGilberry in either of the two incidents.

(5) Making comments during McGilberry's voir dire and closing arguments.

¶108. McGilberry complains of two incidents, one which arose during voir dire and the second occurred during counsel for McGilberry's closing argument. McGilberry fails to show how he was prejudiced by either incident. A review of the record reveals that the trial judge gave both sides wide latitude during their respective arguments. Counsel for both sides took liberties in berating counsel opposite. Importantly, the comments were more of a personal nature than directed at the defendant or the evidence in the case. It would be an understatement to say that emotions were running high during the entire trial and, although each side could have certainly acted with more civility, we do not find that McGilberry was denied a fair trial.

(6) Accusing defense counsel of withholding evidence and names of witnesses.

¶109. The two incidents that McGilberry complains of in this sub-issue were held outside the presence of the jury. For this reason, there is no prejudice arising from these two episodes.

**Conclusion**

¶110. The above complaints did not rise to the level of conduct which require reversal in the cases cited by McGilberry. See *Acevedo v. State*, 467 So. 2d 220, 225-26 (Miss. 1985)(despite repeated admonishment by trial judge prosecutor continually attempted to impeach defendant with inadmissible prior criminal acts); *Smith v. State*, 457 So. 2d 327, 333-36 (Miss. 1984) (appellant was repeatedly subjected to irrelevant, inflammatory, and prejudicial evidence which denied him the right to a fair and impartial trial).

¶111. The test for determining whether an improper argument by a prosecutor requires reversal is "whether or not the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Davis*, 530 So. 2d at 701. Although a death penalty trial is an adversarial event, lawyers on both sides must strive to conduct themselves with civility towards the opposition, the court and the jury; and, their conduct must remain within the permissible bounds of the rules of court and the law as decided by this Court. *See* U.C.C.C.R. 5.01. We hold that neither the events individually nor their cumulative effect was such that their "natural and probable effect" created "unjust prejudice" which resulted in a decision influenced by prejudice. *Davis*, 530 So. 2d at 701. This issue is without merit.

> XV. The trial court erred in denying the Defendant's motion to transport the Defendant to his attorney's office for confidential consultation.

¶112. Defense counsel filed a motion requesting that McGilberry be transported to his office for private consultation because the facilities at the Adult Detention Center in Pascagoula did not provide places for confidential communication. The trial judge found that the facilities were adequate to allow private conferences and directed that the District Attorney's office ensure that the law enforcement officers respected the privacy of the defendant and his counsel.

¶113. McGilberry's trial was held on February 5-9, 1996. After argument of the motion to transport, which was heard on May 12, 1995, there is nothing more in the record concerning counsel's alleged inability to communicate with his client. McGilberry fails to identify specific instances where confidential communication was rendered impossible or hampered by the lack of adequate facilities. On such a factually intensive issue, and without further support in the record, we defer to the sound reasoning of the trial judge. Thus, there was no abuse of discretion, and this issue is without merit.

> XVI. The trial court erred in overruling the Defendant's motion for a mistrial in regard to comments made of a note not admitted into evidence nor authenticated for the purpose of trial.

¶114. On the morning of the murders, McGilberry left his mother a note saying that he would be at Chris's house. During its case in rebuttal, the State made reference to the note, which was never admitted into evidence. McGilberry argues that not only was the note not in evidence, it was never proven that he wrote it. The State concedes that it never attempted to have the note admitted into evidence.

¶115. Reference to a note was made by McGilberry himself in the videotaped confession. He admitted to writing the note before going to Johnson's house to plan the murders. The question posed by the district attorney was a reference to the statement contained within McGilberry's confession. In short, the jury already had knowledge of a note through the introduction and playing of the videotape earlier in the trial. Dr. Maggio viewed the tape in preparation for his trial testimony. There was no abuse of discretion in allowing Dr. Maggio to make reference to a fact that was previously, and properly, introduced to the jury. This issue is without merit.

> XVII. The trial court erred in not giving a basis for acceptance of the State's race neutral reason for striking jurors after Defendant's *Batson* challenged when some of those reasons provided by the State were improper and unconstitutional in regard to religion

¶116. McGilberry made a *Batson* challenge on the first two black jurors who were struck by the State. As to juror Lester Smith, the State responded that she was hesitant about sharing her thoughts on the death penalty. The State's reasons for striking the second juror, Georgina Wells, is the focal point of McGilberry's complaint.

¶117. The State offered three separate reasons for striking Ms. Wells. First, it was noted that she was from the Holiness Church. Second, the State asserted that she avoided making eye contact with the district attorney during voir dire. And, third, Ms. Wells seemed to be in agreement with the defense and ignored Mr. Harkey's questions. The trial judge found that the State's last two proffered reasons were racially-neutral and denied the *Batson* challenge. Later, McGilberry renewed his challenge to Ms. Wells because the State accepted Mr. Charles Ray Davison, who was also a member of the Holiness Church. Although the State had tendered Davison, it attempted to strike him. It seems clear from the record that the State's sole reason for striking Davison was because of his affiliation with the Holiness religion. The trial judge noted that the State's only reason for striking Davison was an impermissible one. Eventually, the State left Davison on the panel tendered to the defense.

¶118. On review, the trial court's determinations under *Batson* are afforded great deference because they are, in large part, based on credibility. *Coleman v. State*, 697 So. 2d 777, 785 (Miss. 1997). This Court will not reverse any factual findings relating to a *Batson* challenge unless they are clearly erroneous. *Id*. A party's peremptory challenge must pass constitutional muster. *Batson v. Kentucky*, 476 U.S. 79 (1986).

¶119. To determine whether a party improperly used a peremptory challenge to discriminate against a potential juror, the objecting party [opponent] must first make a *prima facie* case of discrimination by showing that race was the criteria for the exercise of challenge. *Stewart v. State*, 662 So. 2d 552, 557-58 (Miss. 1995). The burden then shifts to the party exercising the challenge [proponent] to offer a nondiscriminatory reason for its strike. *Id*. It is then left to the trial court to determine whether the objecting party has met its burden to prove there has been purposeful discrimination in exercise of the challenge. *Id*. Because McGilberry is alleging that the State made its strikes on the basis of religion, our focus is on the third prong or the pretext part of the test.

¶120. This prong requires that the trial court determine if the opponent of the strike has carried his overall burden of proving purposeful discrimination. Primarily, this determination will turn on

whether the proponent's proffered reasons are pretextual. The court will examine the reasons given by the proponent; and, "[a]t that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

¶121. In *Mack*, we recognized that the stronger the *prima facie* case, the more cogent the explanations from the proponent and supporting evidence must be and vice versa. *Mack*, 650 So. 2d at 1298. In other words, the relative strength of the *prima facie* case of purposeful discrimination established at step one will often directly color the inquiry into whether any given reason is mere pretext. *Id*. These determinations fall squarely within the province and expertise of the trial judge, who will not be reversed except upon a showing of clear error. *Batson*, 476 U.S. at 98 n.21; *Collins*, 691 So. 2d at 926; *Davis*, 660 So. 2d at 1242.

¶122. Recently, we held that a peremptory challenge based solely on religious affiliation violates the Mississippi Constitution and statutory law. *Thorson v. State*, 721 So. 2d 590, 594 (Miss. 1998). Ironically, the prosecutor's reason for the strike in *Thorson* was that the juror was a member of the Holiness faith. *Id*. at 595. Despite striking the juror due to her religious beliefs, the State offered other sufficient reasons for the strike. That the State had other sufficient neutral reasons rendered the error harmless. *Id*. at n. 6.

¶123. Turning to McGilberry's claims, it is clear that the trial judge accepted the State's race-neutral reasons for striking Ms. Wells. That the State also mentioned her religious affiliation is harmless in light of the presence of acceptable neutral reasons. As to juror Davison, any error was cured when the State withdrew its attempts to strike him and placed him on the panel tendered to the defense. In fact, Davison ended up on the jury. As such, there is no error, reversible or otherwise, with respect to juror Davison. This entire claim is without merit.

> XVIII. If any of these issues standing alone is not sufficient to create reversible error, then the cumulative effect of these issues, combined with the heightened standard of review in capital cases creates reversible error.

¶124. McGilberry maintains that should this Court not find any one error sufficient to warrant reversal of the death sentence in this case, the accumulation of such errors should be taken into consideration and the sentence reversed because of cumulative error. He states that the issues, *supra*, all go to the essence of whether he received a fair trial under the rights set forth in the Fifth and Sixth Amendment. McGilberry, however, does not provide a listing of "near-errors" which require this case to be reversed under a cumulative error analysis. *See Foster v. State*, 639 So. 2d 1263, 1303 (1994). As in *Foster*, we are left to create our own list.

¶125. This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that independently would not require reversal. *Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992); *Hanson v. State*, 592 So. 2d 114, 153 (Miss. 1991). "It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." *Conner v. State*, 632 So. 2d 1239, 1278 (Miss.1993) (*citing Woodward v. State*, 533 So. 2d 418, 432 (Miss. 1988)).

¶126. We have conducted a thorough review of the record, the briefs, and the argument and determined that there are no individual errors which require reversal of either McGilberry's conviction or his sentence. McGilberry argues that the collective "bad" acts of the prosecutor dictate reversal under the cumulative error analysis. While his trial was not perfect, we do not find any errors, either individually or cumulatively, which warrant reversal. A criminal defendant is not entitled to a perfect trial, only a fair trial. *Sand v. State*, 467 So. 2d 907, 911 (Miss. 1985). The evidence of guilt in this case was overwhelming and, while not before this Court on an assignment of error, our independent review of the sentencing phase reveals no errors. McGilberry received all that he was entitled to a fair trial. This assignment of error is without merit.

> XIX. Whether the imposition of the death penalty is disproportionate in this case to other death sentences upheld by the Court and is cruel and inhuman punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitutions and Article 3, Section 28 of the Mississippi Constitution of 1890.

¶127. This Court is required to review the imposition of the death penalty to ensure that its implementation is proportionate. Miss. Code Ann. § 99-19-105 (Supp.1998). Our assessment consists of examining other death penalty cases reviewed on appeal. The Court considers the crime and the defendant. *Wilcher v. State*, 697 So. 2d 1087, 1113 (Miss. 1997).

¶128. McGilberry was 16 years of age when the crimes were committed. He has argued, without success, that he was unable to determine right from wrong at the time of the crimes. On October 27, 1991, McGilberry possessed a full scale intelligence quotient of 97, which is in the average range. By 1995, McGilberry's IQ had fallen to 83, still within the average range. Dr. Deal diagnosed McGilberry with a significant mental defect which he classified as a "sociopathic personalty structure." The question of McGilberry's competence was decided by the jury and we find nothing in the record which renders the punishment of death disproportionate.

¶129. Likewise, McGilberry's age does not prohibit the death penalty from being carried out. In similar cases, we have found that the death penalty was not cruel and inhuman punishment as applied to defendants in the 16-18 year-old range. *See Foster*, 639 So. 2d at 1303-04; *Johnson v. State*, 508 So. 2d 1126 (Miss. 1987); *Cannady v. State*, 455 So. 2d 713 (1984); *Jones v. State*, 381 So. 2d 983 (Miss. 1980).

¶130. This Court is also bound to determine whether the evidence supports the jury's finding of aggravating circumstances found in Miss. Code Ann. § 99-19-105 (Supp.1998). *See* Miss. Code Ann. § 99-19-101 (1994).

¶131. As to each of the four victims, the jury found that the following facts existed: that McGilberry actually killed the victim; that McGilberry intended the killing of the victim; and, that McGilberry contemplated that lethal force would be used. Next, the jury found that the aggravating circumstances were: McGilberry created a great risk of death to many persons; the capital offense was committed for pecuniary gain during the course of a robbery; and, that the capital offense was especially heinous, atrocious or cruel. The jury found that these aggravating circumstances outweighed five mitigating factors taken from Miss. Code Ann. § 99-19-101(6) (1994).

¶132. Kenneth Purifoy was struck at least four times in the face while sleeping in his bedroom. The blows crushed the right side of his face, splitting his right ear in half and driving the skull into the brain. There was no indication that Kenneth was able to defend himself in any way, as he was found in what was considered to be a sleeping position.

¶133. Kimberly Self, who was also asleep in her bedroom, was struck between 4 and 6 times to various parts of her body. She was struck on both sides of head, across her eyes, on the bridge of her nose and under her jaw. Unlike the other victims, some of her wounds were defensive ones found on her arms and hands. Additionally, she was found laying perpendicular on the bed, further evidence that she was conscious after the first blow.

¶134. Patricia Purifoy was killed as she lay in a recliner in the living room. She received two blows directly to her facial area. One blow struck her across the eyes, rupturing both eye balls and smashing the bones of her nose into the base of her brain. The other blow struck Patricia in the face and forehead with enough force to crush the bones and drive them into the cranial cavity and brain tissue.

¶135. Three-year-old Kris was struck once with a baseball bat. The blow was delivered as Kris lay face down on the sofa in the living room near his grandmother. He had a crushing injury to the back of his head. His scalp and skull were driven in, breaking the bone and puncturing the brain tissue.

¶136. McGilberry stands convicted of brutally murdering his mother, his stepfather, his sister and his three year-old step nephew. The method used, bludgeoning with a baseball bat, was both gruesome and grisly. The evidence showed that the crimes were premeditated and contemplated over a period of at least two weeks. McGilberry bludgeoned his family so that he could steal a car, some cash, a money order, and a credit card and then run away from home. The jury decided his fate, and we find no reason to disturb the verdict or sentence.

## CONCLUSION

¶137. For the reasons set forth above, McGilberry's arguments are without merit. There is nothing in the record suggesting that his rights were violated or that he was deprived of a fair trial. Thus, this Court affirms the jury's verdict of guilty, and the subsequent sentence of death, and the judgment of the Jackson County Circuit Court.

¶138. CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(Supp.1998) AND M.R.A.P. 41(a).

PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., SMITH AND MILLS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY BANKS, J. COBB, J., NOT PARTICIPATING.

McRAE, JUSTICE, DISSENTING:

¶139. The prosecutor in this case impermissibly made statements reflecting on the defendant's constitutional right to remain silent. So long as those statements could reasonably have been construed by the jury as a comment on the defendant's failure to testify, it matters not what the prosecutor may have intended his statements to mean. Because of this error and the fact that the court erred in not suppressing the minor defendant's confession, I dissent.

I.

¶140. Both the Fifth Amendment to the United States Constitution and Art. 3, § 26 of the Mississippi Constitution provide that the accused may not be compelled to give evidence against himself. The right to refrain from testifying against himself avails the defendant nothing, however, if his failure to testify can be used against him. This is why we have long prohibited the prosecutor from commenting, either directly or indirectly, on the defendant's choice not to take the witness stand. *See, e.g., Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Griffin v. State*, 557 So. 2d 542, 552 (Miss. 1990); *Jimpson v. State,* 532 So.2d 985, 991 (Miss. 1988)*; Livingston v. State,* 525 So.2d 1300, 1305-08 (Miss. 1988)*; Bridgeforth v. State*, 498 So.2d 796, 798 (Miss. 1986); *Wilson v. State*, 433 So.2d 1142, 1146 (Miss. 1983); *Yarbrough v. State*, 70 Miss. 593, 12 So. 551 (1893).

¶141. If a prosecutor's statement can reasonably be construed by jury as a comment on accused's failure to testify, it is immaterial that the prosecutor may have intended to refer to a situation other than the trial-in-chief. *Davis v. State,* 406 So.2d 795, 801 (Miss. 1981); *Reddick v. State,* 72 Miss. 1008, 16 So. 490 (1895).

¶142. In this case, the prosecution told the jury as follows:

You want to know why we have fingerprints, DNA, bloodstains, pattern interpretation, blood analysis from serologists? Why? Steven McGillberry pled not guilty. And he doesn't have to do a thing. He sits there. We have to prove the case.

¶143. In any trial where the defendant exercises his constitutional right not to testify, a prosecutor who directs the jury to look at the defendant just sitting there, not having to do a thing, is attempting to draw the jury's attention to the fact that the defendant did not take the stand. There is just no other reasonable explanation for a prosecutor's reference to the fact that the defendant "sits there."

¶144. In *Reed v. State*, 197 So.2d 811, 814 (Miss.1967), the district attorney asked the jury to "[l]ook at the defendant. I have observed him for the past two days and he sat and showed no emotion whatever during the trial of this cause." This Court reversed the conviction holding that such argument was an impermissible comment on the defendant's failure to testify.

¶145. The Supreme Court of South Carolina reversed where a similar argument was made in *State v. Cockerham,* 294 S.C. 380, 365 S.E.2d 22 (1988). The prosecutor in that case asked the

jury "imagine what kind of mood that young man was in the night the victim was killed, as he sits here today as quiet as can be." The prosecutor's argument, the Court held, "was an indirect but unmistakable reference to appellant's silence at trial."

¶146. This Court has repeatedly admonished prosecutors to abstain from commenting on the defendant's exercise of his constitutional rights. In *Wilson v. State*, 433 So.2d 1142 (Miss. 1983), we warned:

> District attorneys must not directly, or by innuendo and insinuation, comment on a defendant's not testifying. Any person competent to be a prosecuting attorney knows that elementary principle of law. If a prosecuting attorney, who is presumed to know better, persists in making erroneous and prejudicial remarks in his argument before the jury, then the trial court should deal harshly with him to the extent of sanctions, reprimands and contempt. This Court will not look for some reason to excuse such action of a prosecuting attorney, even though a new trial would be expensive to the people of the county. Such expenses, fault, and blame should be placed at the door of the person who is responsible for it.

*Wilson*, 433 So.2d at 1146. *See also Bridgeforth v. State*, 498 So.2d 796 (Miss. 1986).

¶147. The majority's opinion in this case does just what we said we would not do in *Wilson*, i.e. excuse the improper comment of the prosecutor. The majority characterizes the prosecutor's comment as an explanation "that it was the State who bore the burden of proof and that it was not incumbent upon the defense to prove anything to the jury." I , however, fail to see how a prosecutor's advising the jury to look at the defendant just sitting there doing nothing could be construed as anything but a comment on the defendant's failure to take the witness stand.

## II.

¶148. I also dissent with respect to the denial of McGillberry's motion to suppress his confession. McGillberry was sixteen years old at the time of the crime. I have previously opined that I do not believe that it is appropriate for the the justice system to treat minors as children on every occasion except where they have the most to lose, i.e. in criminal matters where the child's very freedom is at stake. *Clemons v. State*, No. 97-KA-00373-SCT, 1999 WL 62782 (Miss. 1999).

¶149. We continue to cling to the notion that a minor does not possess the sophistication to make informed decisions in civil matters but is intelligent enough to do so in all matters criminal. I find this to be ironic given that in this country we profess to believe that a person's freedom should have greater protections than his pocketbook. Our laws would zealously shelter the child who wishes to purchase, perhaps unwisely, an automobile, but provide him none of the protections typically given youths when the same child is accused of murder.

¶150. Persons fourteen and under cannot consent to sexual intercourse [Miss. Code Ann. § 97-3-65(1)(b) (1998)][(14)]; if they are under eighteen, they cannot legally enter into contracts, buy or sell property, vote, maintain a residence or even choose the parent with whom they wish to live when their parents divorce. Under the age of twenty-one, a person cannot drink alcohol, purchase tobacco, or enter a casino.

¶151. Indeed, many jurisdictions consider anyone under the age of fourteen to be of "tender years"[15] and thus, deserving of special protection from the legal system. For instance, a child of tender years is entitled to invoke the attractive nuisance doctrine to recover from a landowner who permits the existence of a dangerous condition on his property of the sort likely to attract children. *Hughes v. Star Homes, Inc.,* 379 So.2d 301, 304 (Miss. 1980). Because of their immaturity, children may not testify without the trial court having first satisfied itself that the child is capable of testifying. In *Veasley v. State*, No. 95-CT-00367-SCT, 1999 WL 233840 (Miss. 1999), we held that there is a rebuttable presumption that a child under the age of twelve is of tender years and that for children twelve and over, the trial court must make an on-the-record determination of whether they are of tender years for the purpose of admitting testimony under the hearsay exception of M.R.E. 803(25). *See also Brent v. State*, 632 So.2d 936, 942 (Miss.1994) ("[b]efore allowing a child witness to testify, the trial judge should determine 'that the child has ability to perceive and remember events, to understand and answer questions intelligently and to comprehend and accept the importance of truthfulness").

¶152. The legislature has defined a "minor" as well as an "infant" as anyone under the age of twenty-one. Miss. Code Ann. § 1-3-27 (defining minor); § 1-3-21 (defining infant). A child or youth has been defined by the legislature as anyone under the age of eighteen. Miss. Code Ann. §43-16-3(a); § 43-17-3(c); §43-21-105(d); § 43-23-3(c).

¶153. Therefore, I maintain, as I did in my dissent in *Clemons v. State*, No. 97-KA-00373-SCT, 1999 WL 62782 (Miss. 1999), that this Court is in error when it fails to extend the special protections given minors to the criminal arena.

¶154. Accordingly, for the same reasons I expressed in *Clemons,* I respectfully dissent.

**BANKS, J., JOINS THIS OPINION AS TO PART I**


## APPENDIX

### DEATH CASES AFFIRMED BY THIS COURT

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990)

vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

\*_Clemons v. State_, 535 So. 2d 1354 (Miss. 1988), _Clemons v. Mississippi_, 494 U.S. 738 (1990) vacating and remanding, _Clemons v. State_, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

\*_Jones v. State_, 517 So. 2d 1295 (Miss. 1987), _Jones v. Mississippi_, 487 U.S. 1230 (1988) vacating and remanding, _Jones v. State_, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED

## FOR A NEW TRIAL ON SENTENCING PHASE ONLY

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); sentence aff'd 684 So. 2d 1179 (Miss. 1996)

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), cert. denied *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley*

*v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.


1. McGilberry also asserts that Brenda Saucier, acting *in loco parentis*, attempted to speak with McGilberry and obtain counsel for him. This assertion is factually incorrect. Ms. Saucier testified that she had not attempted to see McGilberry, nor did she attempt to obtain counsel for him.

2. Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

3. The record in the case at bar is devoid of a jury instruction directing the jury not to draw unfavorable inferences from McGilberry's failure to testify. Such instruction was one of three relied on by the Court in *Blue*.

4. The State's brief notes that this occurred during the sentencing phase of the trial. The record reveals, however, that Mr. Harkey's comments were made during the guilt phase.

5. Other decisions also support the application of the procedural bar. *See Rushing v. State*, 711 So. 2d 450, 455 (Miss.1998); *Lester v. State*, 692 So. 2d 755, 795 (Miss. 1997); *Gray v. State*, 487 So. 2d 1304 (Miss.1986); *Shavers v. State*, 455 So. 2d 1299 (Miss.1984); *Baker v. State*, 327 So. 2d 288 (Miss.1976).

6. Any error that occurred in *McFee* was cured when the trial judge sustained a prompt objection and instructed the jury to disregard the comment.

7. Dr. Deal testified that McGilberry said that Kimberly had tried to get him to take nude photographs of her when he was younger and that Patricia had poured milk over his head on one occasion.

8. McGilberry assigned as a separate issue that he could not be guilty of stealing the child support money order because it was for his benefit and, thus, his property. This argument is dealt with *infra*.

9. McGilberry needed Patricia's drivers license to cash the child support check.

10. Dr. Roy Deal was appointed by the court to evaluate McGilberry at the request of his counsel. Dr. Deal is a board certified psychiatrist who practices on the coast.

11. At the time of the crime, the Uniform Criminal Rules of Circuit Court Procedures (UCRCCP)

were in effect. Under U.C.R.C.C.P., the appropriate rule would be 4.01. Since that time, however, the Court has enacted the Uniform Circuit and County Court Rules, or U.C.C.C.R., and the correct rule number is 9.01. The text of both U.C.R.C.C.P. 4.01 and U.C.C.C.R. 9.01 is identical. Thus, we refer to the U.C.C.C.R.

12. This was because Manning did not attempt to use an insanity defense at trial. Further, he was examined and found competent to stand trial.

13. Mr. Harkey was responding to Dr. Deal's assertion that a previous psychiatrist who examined McGilberry failed to recognize what he was dealing with.

14. Indeed, mistake as to the victim's age is no defense to statutory rape. *Collins v. State*, 691 So.2d 918 (Miss. 1997). "The age of the victim makes or breaks the conviction." *Washington v. State*, 645 So.2d 915, 919 (Miss. 1994).

15. See Comment to Miss.R.Evid. 803(25). The Comment advises that children over fourteen may be considered to be of tender years where they have a mental age of less than fourteen. See, e.g., *Hashtani v. Duke Power Co.,* 578 F.2d 542 (4th Cir. 1978) (14 year old who had flunked first grade was of tender years and entitled to invoke attractive nuisance doctrine).