837 So.2d 235 (2003)
Ronnie Dean BEARD, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2000-KA-01849-COA.
Court of Appeals of Mississippi.
February 4, 2003.
*236 John Keith Perry, attorney for appellant.
Office of the Attorney General, by Charles W. Maris, attorney for appellee.
EN BANC.
KING, P.J., for the court.
¶ 1. Ronnie Dean Beard was convicted in the DeSoto County Circuit Court of kidnapping, rape, and armed robbery. On the rape charge, he was sentenced to a term of life imprisonment without parole as an habitual offender; he was sentenced to a term of twenty-seven years on the kidnapping charge as an habitual offender to run consecutively to the sentence imposed on the rape charge, and sentenced to a term of twenty-seven years as an habitual offender on the armed robbery charge which is to run consecutively as well. Beard has appealed and raised the following issues:
I. Whether the trial court erred by denying his motion for a mistrial.
II. Whether the trial court erred by denying his request for a judgment notwithstanding the verdict, or in the alternative a new trial.

FACTS
¶ 2. On Friday, April 24, 1998, B. Campbell[1] was landscaping her front yard. Her then five year old son was playing in the backyard. While outside, someone (later determined to be Beard) approached Campbell from behind and placed a knife against her throat. Campbell stated that the attacker forcibly took her inside the house and demanded money. She indicated to him that she did not keep cash but offered him jewelry instead. Campbell stated that he took the jewelry and proceeded to cut off her sweatshirt, took her in a bathroom, and attempted to rape her. Unsuccessful at his attempt, he then took her into a bedroom and did in fact rape her.
¶ 3. After the incident occurred, Beard instructed Campbell to take a bath and douche herself. When Campbell informed Beard that she did not have any douche products in the house, he gave her a bottle to use. According to Campbell, she was unable to see the attacker during this time because he had pulled the shirt over her face. Beard instructed her not to tell anyone because he knew where she lived and would kill her and her son.
¶ 4. Beard warned Campbell to stay in the bathroom. He then left the house walking down the street. After Beard left, Campbell instructed her son not to leave, retrieved her .45 pistol, got into her pickup truck and proceeded to chase Beard. She *237 saw Beard get in a white Mitsubishi Eclipse parked down the street. Campbell drove up to the car so that she was adjacent to the driver's side window. She shot into the car, after which the driver sped away.
¶ 5. Unable to stop the other driver, she returned home and called the police on her cell phone. The police arrived and Campbell was taken to the hospital where a rape kit was collected.
¶ 6. At trial, Ernie Cleveland, an electrician who was in the area at the time of the incident, testified that he saw a white truck pull up to a white car and that the truck's driver started shooting at the car. He noticed that the car lost one of its hubcaps as it sped off.
¶ 7. One of Campbell's neighbors, Brenda Lacker, testified that she saw a white car parked near her house and an unknown man who proceeded towards Campbell's house. Later, Lacker heard gunshots and saw the white car speed out of the neighborhood.
¶ 8. Officer Aubrey Broadway, with the Olive Branch Police Department, located a hubcap on the scene which had a Ford label inside. Officer Broadway requested that other agencies be on the lookout for a white Ford Probe. However, Campbell described the vehicle as a Mitsubishi Eclipse. Officer Broadway's information was later supplemented to include a white Mitsubishi Eclipse.
¶ 9. While investigating an unrelated case in August 1999, Alan Thompson with the Mississippi Highway Patrol interviewed Deborah Rayford who once lived with Beard. Ms. Rayford told Officer Thompson that Beard had driven a white Mitsubishi for several weeks in April of 1998. Ms. Rayford indicated that Beard had been shot during this time period and that while at her grandmother's home she witnessed him trying to remove bullets from his body, instead of going to the hospital.
¶ 10. Based on Ms. Rayford's information, the police obtained an address where the white car could be located. Upon executing a search warrant, the officers located the vehicle which was in fact a Mitsubishi Eclipse. Inside the driver's door, the officers found a copper jacketed bullet, which was later determined to have been fired from Campbell's gun. The hubcap was also determined to match the other hubcaps located on the car.
¶ 11. Beard was then arrested, and a warrant was obtained which allowed x-rays of Beard's left leg and arm as well as the collection of blood and saliva samples. Photographs taken of Beard's body revealed old puncture injuries to his left arm and leg.
¶ 12. At trial, Dr. Robert Smith, testified that the x-rays revealed that Beard's left leg appeared to contain bullet fragments.
¶ 13. Samples from Campbell's rape kit were sent to the DNA Unit of the FBI Crime Lab in Washington, D.C. Deborah Hobson, a forensic scientist with the DNA Unit of the FBI Crime Lab testified that "the source of the semen that was detected in the vaginal swabs is from Mr. Beard."
¶ 14. Beard was convicted and sentenced to consecutive, habitual terms of twenty-seven years, life imprisonment, and twenty-seven years respectively in the custody of the Mississippi Department of Corrections on the charges of kidnapping, rape, and armed robbery.

ISSUES AND ANALYSIS

I.

Whether the trial court erred by denying his motion for a mistrial.
¶ 15. Beard contends that the trial court erred by denying his motion for a *238 mistrial after one of the police officers made a statement that was a conclusion of fact while testifying "indicating the guilt of Defendant." He maintains that the statement caused him to receive an unfair trial, despite the corrective action taken by the trial judge.
¶ 16. The transcript reveals that the following testimony was given by Officer Alan Thompson:
Q. All right. And did she (the suspect's ex-girlfriend) tell you about him (the suspect) being shot?
A. Yes, she did. She told me he was shot; that she witnessed Ronnie Beard trying to extract bullets from the side of his buttocks and also his arm while Ronnie was there at her grandmother's home.
Q. Now, after you obtained this information from Mrs. Rayford, what did you immediately know?
A. I knew that most likely Ronnie Beard was the Olive Branch rapist.
BY MR. TRAVIS: Your Honor, we're going to object to that and ask that be stricken. That's conclusionary in nature.
BY THE COURT: I'm going to sustain it. That will be struck and the jury is to disregard that. That's a conclusion of fact which only you can make, not this police officer.
Subsequently, Beard made a motion for a mistrial stating:
BY MR. PERRY: Your Honor, at this time we'd like to make a motion to have a mistrial. The statement from Alan Thompson came in on the record in front of the jury, and it was highly prejudicial and inflammatory and it served no purpose, as well as testifying to the ultimate issue of the trial. He characterized Ronnie Dean Beard as the Olive Branch rapist, and such characterization, you can't throw it into the jury box and ask the jury just to disregard it. And in light of that, we ask at this time and we think it's only proper that the Defense move for a mistrial.
The trial court denied that motion stating:
BY THE COURT: Okay. Well, I'll deny the motion for a mistrial and stand on the ruling that the jury was instructed to disregard; and if you want a specific instruction to go to the jury, if and when we get to deliberations, then you can have that.
¶ 17. One of the jury instructions given states in part that "[y]ou are to disregard all evidence which was excluded from consideration during the course of the trial." However, Beard asserts that although the trial judge gave a curative instruction, the comment made was "so prejudicial that the curative instruction could not have sufficed to ensure the defendant got a fair trial."
¶ 18. Beard relies on Vickery v. State, 535 So.2d 1371, 1380 (Miss.1988), where the supreme court held that the trial court's curative instruction regarding inadmissible testimony given by a police officer was ineffective. In Vickery, defense counsel questioned the police officer about keys taken from the defendant when she was arrested. Over objection, the trial court allowed the officer to explain his response. The officer then stated, "[i]t's been my experience that people involved in the drug business try very hard and they're very good at covering their tracks. And I'm sure that this Defendant had keys to Apartment 119." Id. at 1379. After making this statement, the trial court asked the jury to "disregard any statement as to whether the Defendant had keys to this apartment as an expression of this witness's opinion." Id. at 1380.
¶ 19. Where an objection to such impermissible testimony is sustained *239 and the jury is admonished by the trial court to disregard the statement, the supreme court has repeatedly held that refusal to grant a mistrial is proper. McNeal v. State, 658 So.2d 1345, 1348 (Miss.1995). The applicable standard of review for denial of a motion for mistrial is abuse of discretion. McGilberry v. State, 741 So.2d 894(¶ 32) (Miss.1999). This Court finds that there was no abuse of discretion by the trial court.

II.
Whether the trial court erred by denying his request for a judgment notwithstanding the verdict, or in the alternative a new trial.
¶ 20. Beard contends that the trial court erred by denying his request for a judgment notwithstanding the verdict, or in the alternative a new trial. He maintains that the State failed to meet its burden of proof, and that the verdict is contrary to the overwhelming weight of the evidence.
The standard of review for a denial of a judgment notwithstanding the verdict and a directed verdict are identical. The Mississippi Supreme Court has stated that in reviewing the trial court's denial of JNOV:
[T]he sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. The credible evidence consistent with [the defendant's] guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence.... We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
Wash v. State, 790 So.2d 856(¶ 19) (Miss. Ct.App.2001) (citations omitted).
¶ 21. Beard asserts that the State's proof hinged upon circumstantial evidence and that there were gaps in the chain of custody which provided ample opportunity for altering evidence and therefore produced a verdict contrary to the weight of the evidence. At trial, the court denied Beard's motion for directed verdict based on these assertions and determined that the State had met its burden of proof required by law.
¶ 22. The test of whether there has been a proper showing of the chain of possession of evidence is whether there is any reasonable inference of likely tampering with or substitution of evidence. Williams v. State, 794 So.2d 181(¶ 10) (Miss.2001). The burden to produce evidence of a broken chain of custody is on the defendant. Id. Beard has produced no evidence which suggests that tampering or substitution of evidence occurred.
¶ 23. Beard made trial objections as to the chain of custody of the hubcap evidence and the DNA. The trial court found, and the record reflects, that a proper chain of custody was established for each of these items.
¶ 24. With respect to the hubcap, Ernie Cleveland saw the hubcap fall off the vehicle and reported it to Officer Aubrey Broadway of the Olive Branch Police Department, who indicated that he photographed the hubcap on the scene, placed it in a bag and took it to the police department where it was placed in the evidence room. Broadway took the hubcap from the evidence room on the day he went to photograph the suspect's car and held it beside the other wheel covers which were photographed. Broadway stated that the hubcap was maintained in either his custody or in the evidence room until it was turned over to the district attorney's office.
*240 ¶ 25. With respect to the DNA, Deborah Hobson, a forensic scientist with the DNA Unit of the FBI Crime Lab, indicated that evidence was submitted on October 15, 1998, by Amy Winters of the Mississippi Crime Laboratory. Hobson stated that once she tested the samples from Campbell, she sent them back to Winters. On October 15, 1999, Hobson received a blood sample from Beard from Winters and followed the same procedures.
¶ 26. Because Beard's argument is predicated upon the lack of a proper chain of custody, the finding that the chain of custody was properly established, means that there is no merit to his argument. This Court affirms the ruling made by the trial court.
¶ 27. THE JUDGMENT OF THE DESOTO COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I KIDNAPPING AND SENTENCE OF TWENTY-SEVEN YEARS; COUNT II RAPE AND SENTENCE OF LIFE; COUNT III ARMED ROBBERY AND SENTENCE OF TWENTY-SEVEN YEARS, ALL AS AN HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS. SENTENCE IN COUNT I SHALL RUN CONSECUTIVELY TO SENTENCE IN COUNT II. SENTENCE IN COUNT III SHALL RUN CONSECUTIVELY TO SENTENCE IN COUNT I. ALL COSTS OF THIS APPEAL ARE ASSESSED TO DESOTO COUNTY.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, AND CHANDLER, JJ., CONCUR. GRIFFIS, J., NOT PARTICIPATING.
NOTES
[1] Due to the nature of the offense, the victim's real name is not being used for purposes of this opinion.