994 So.2d 808 (2008)
James R. WILLIAMS, III, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-01338-COA.
Court of Appeals of Mississippi.
March 25, 2008.
Rehearing Denied July 22, 2008.
Certiorari Denied November 13, 2008.
*811 Julie Ann Epps, Canton, Robert Farley Wilkins, attorneys for appellant.
Office of the Attorney General by Ladonna C. Holland, attorney for appellee.
Before KING, C.J., ROBERTS and CARLTON, JJ.
CARLTON, J., for the Court.
¶1. Seventeen-year-old James R. Williams, III (Williams) was indicted for the murder of his father and stepmother, James R. Williams, Jr. (James Jr.) and Cynthia A. Williams (Cynthia), respectively. He was convicted by a Hinds County Circuit Court jury on both counts and sentenced to serve two concurrent terms of life imprisonment. Williams appeals and raises seven issues:
I. Whether the trial court erred in denying Williams's motion to suppress.
II. Whether the trial court erred in failing to require the prosecution to call Officer Dexter Johnson and Officer Kevin Ainsworth at the suppression hearing.
III. Whether the trial court erred in prohibiting the defense from using extrinsic evidence of a prior inconsistent statement to impeach Adam White.
IV. Whether the trial court erred in limiting the defendant's cross-examination of Adam White.
V. Whether the trial court erred in requiring the defense to conduct direct examination of Adam White during the prosecution's case-in-chief.
VI. Whether the trial court erred in refusing a jury instruction on accessory after the fact.
VII. Whether Williams is entitled to a new trial based on cumulative error.
¶2. We find no error and affirm.

FACTS
¶3. On December 28, 2002, Williams and Adam White (White) helped James Jr. and Cynthia move into a new home. On January 3, 2003, James Jr. and Cynthia were reported missing; officers of the Jackson Police Department went to their house at 265 Winfield Street to investigate. There they found Williams, who told the officers that he had last seen James Jr. and Cynthia on the evening of December 28, 2002, and did not know their whereabouts. No foul play was suspected until January 5, 2003, when police returned to the house in furtherance of their investigation and found traces of blood.
¶4. The investigation focused on Williams, who was the last person known to have seen his father and step-mother. On January 5, 2003, Williams was taken to police headquarters for questioning at approximately 3:00 p.m. After waiving his Miranda rights, Williams gave the first of two statements at approximately 6:30 p.m. In this statement, Williams simply restated that he had last seen James Jr. and Cynthia on the evening of December 28, 2002, and did not know where they were. Prior to Williams's second statement, White was brought in and questioned. White identified Williams as the murderer and told police that he knew where the bodies were located. White then set out with Officers Perry Tate and Kent Daniels to recover the bodies, which were discovered at approximately 1:00 a.m., January 6, 2003.
*812 ¶5. Meanwhile, Williams's mother and stepfather, Sandra McFarland (Sandra) and Steven McFarland (Steven) (collectively "the McFarlands"), arrived at police headquarters. According to the McFarlands, they told police officers, in Williams's presence, not to question him further without an attorney. The facts pertaining to this event are discussed more fully below. The McFarlands left police headquarters at approximately 3:30 a.m. after being assured that Williams would not be questioned further.
¶6. Shortly thereafter, Officers Tate and Daniels, who had recently returned from searching for the bodies, approached Williams and obtained from him a second waiver of rights and a confession. Williams's confession represented that on the evening of December 28, 2002, James Jr., as an extreme disciplinary measure, beat him and pulled a gun on him for missing work a couple of days earlier. Williams claimed that James Jr. then sat down on the couch, and he (Williams) retrieved a gun from his room, returned to the living room, and shot James Jr. Williams stated that Cynthia then walked into the room and started screaming at him; whereupon, Williams shot and killed her also.
¶7. In April 2003, Williams was indicted for the murders of James Jr. and Cynthia.[1] Prior to trial, Williams filed a motion to suppress his confession claiming, among other things, that it was taken in violation of his Fifth Amendment rights. The trial judge denied Williams's motion to suppress, and the case proceeded to trial. At trial, Williams and White offered drastically different versions of the events surrounding the killings.

White's Testimony
¶8. White, the prosecution's star witness, testified that Williams killed James Jr. and Cynthia; then Williams forced him with threats of violence to help cover up the crime by disposing of the bodies and cleaning the house. Specifically, White stated that he and Williams helped James Jr. and Cynthia move until approximately 7:30 p.m. Williams then dropped White off at White's grandmother's house to eat dinner. Williams returned at approximately 11:00 p.m. and told White, "we're going to go for a ride." According to White, Williams stepped out of the car with a .22 rifle in hand, unloaded the gun, handed it to White, and told him to "chuck it" over the fence; White complied. At that point, White figured that Williams had killed his parents because, according to White, Williams told him the day before that he was going to kill James Jr. and Cynthia by putting rat poison in their milk.
¶9. Williams then drove White to James Jr. and Cynthia's house, opened the door and said, "you're about to help me do this." White claimed that he told Williams that he wanted no part of it, but Williams threatened him by saying, "either you can be with me or you can be with them," pointing to the lifeless bodies. In fear for his life, White helped Williams load the bodies into the back of James Jr.'s truck. Williams drove the truck and ordered White to follow in Williams's car. White followed Williams to a wooded area in or around Brandon, Mississippi and stopped as Williams drove the truck off of the road and into a tree. According to White, the two then returned to James Jr. and Cynthia's house in Williams's car and cleaned the scene.

Williams's Testimony
¶10. Williams testified that James Jr. accidentally shot Cynthia, and White shot James Jr. To this end, Williams claimed *813 that when White arrived at James Jr. and Cynthia's house to lend a hand moving, he brought a 9mm handgun along to show Williams. As James Jr. entered the living room, White hid the gun under a love seat cushion. Later, James Jr. discovered the gun when he sat on the love seat and noticed a lump. According to Williams, James Jr. then accused White of planning to rob him, became irate, and began waving the gun around. When Cynthia entered the living room, James Jr. turned and the gun haphazardly discharged in Cynthia's direction, fatally wounding her. Williams testified that White then retrieved a .22 rifle from Williams's room, pointed it at James Jr. and ordered him to drop the 9mm. As Williams tried to calm James Jr. and coax the gun from his hand, James Jr. hit him in the stomach and pushed him across the room. Williams claimed that James Jr. then turned toward White and started to draw the gun; at which point, White shot James Jr., who fell on the couch. According to Williams, White shot James Jr. with the .22 rifle until it was empty, picked up the 9mm, and shot him three more times. Williams testified that he helped White dispose of the bodies and clean the scene under duress from White's threats of death.
¶11. At the conclusion of trial, the jury found Williams guilty on both counts. Williams's motion for a new trial was denied. Aggrieved, Williams now appeals to this Court.

DISCUSSION

I. Whether the trial court erred in denying Williams's motion to suppress.
¶12. To be admissible, a confession "must have been intelligently, knowingly and voluntarily given, and not a product of police threats, promises or inducements." Wilson v. State, 936 So.2d 357, 361 (¶8) (Miss.2006) (citing Manix v. State, 895 So.2d 167, 180 (¶39) (Miss. 2005)). In determining the admissibility of a confession, the trial court sits as the finder of fact, and we will not disturb its decision unless manifestly wrong. Wilson, 936 So.2d at 361 (¶8) (citing Glasper v. State, 914 So.2d 708, 716 (¶21) (Miss. 2005)).
¶13. At the suppression hearing, the McFarlands testified that as they were leaving police headquarters, they were in a room with Williams, Officer Bret Baily, and Officer James Cornelius. Steven claimed that Officer Kevin Ainsworth was also present at this time. The McFarlands testified that they told the officers not to question Williams without an attorney, and Sandra told Williams not to sign anything or speak to anyone until they got him an attorney. Steven recalled that Williams responded by saying, "thank you so much for coming and helping me here." According to Williams, he responded by saying, "yes ma'am, I understand." Steven testified that Williams never requested an attorney himself.
¶14. Officer Baily testified that the McFarlands did not request an attorney in his presence. Officer Cornelius stated that he never encountered the McFarlands on the night in question. Both officers testified that Williams himself never requested an attorney. Both officers also stated that Officer Ainsworth was not at the police station on the night in question.
¶15. Williams testified that shortly after the McFarlands left, he was presented a waiver of rights. Williams claimed that, at first, he refused to sign the waiver and requested an attorney; but he later signed the waiver and confessed after repeated attempts by the police to question him. He claimed that he was threatened that he *814 would receive a lethal injection if he did not give a statement.
¶16. At the conclusion of the suppression hearing, the trial court determined that "[i]n the totality of the circumstances and considering all of the testimony, some having conflict, the Court is of the opinion that the statement was voluntarily given." The trial judge denied Williams's motion to suppress.
¶17. Williams argues that his confession was taken in violation of his Fifth Amendment right to counsel, which he claims was sufficiently invoked when the McFarlands, in his presence, told police not to question him without an attorney. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Minnick v. Mississippi, 498 U.S. 146, 150, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Williams claims that his acquiescence in, or rather, his failure to issue a countermand to the McFarlands' remarks further supports his position. The State argues that the trial judge did not err because Williams himself did not request an attorney, and a third party cannot invoke a criminal defendant's personal right to an attorney. McGilberry v. State, 741 So.2d 894, 906 (¶25) (Miss. 1999).
¶18. The Fifth Amendment right against self-incrimination requires that before custodial interrogation may take place, a criminal defendant must be advised of his right to have an attorney present. Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); see Reuben v. State, 517 So.2d 1383, 1387-88 (Miss.1987). Once the right to counsel is invoked, questioning must cease unless and until an attorney is present or the defendant himself reinitiates further discussions with police. Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880; Jacobs v. State, 870 So.2d 1202, 1206 (¶9) (Miss. 2004). Where police initiate further communication with the defendant, any statement given is "presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).
¶19. In the instant case, it is undisputed that police reinitiated discussions with Williams after the alleged invocation of his right to counsel. Thus, this issue turns on whether Williams's right to counsel was invoked. If so, his confession was illegal under Edwards.
¶20. As the State argues, a defendant's right to counsel is not invoked by a third party's acting outside the presence and knowledge of the defendant. See Moran v. Burbine, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); McGilberry, 741 So.2d at 906 (¶25) ("the right to counsel must be invoked by the defendant and not by third parties acting outside the knowledge of the defendant"). Williams contends that the "no third party rule" does not apply to his situation because the McFarlands made a request for counsel in his presence. However, in light of our supreme court's decision in Lee v. State, 631 So.2d 824, 827 (Miss.1994), we find this distinction of no consequence to the outcome of this case.
¶21. In Lee, the defendant's sister made a statement to police regarding counsel, in the defendant's presence, during the course of his arrest. Lee, 631 So.2d at 825-27. The defendant later waived his Miranda rights and gave an inculpatory statement without further indication that he wished to speak with police only in the presence of counsel. Id. In affirming the trial court's decision not to suppress the confession, our supreme *815 court rejected the defendant's contention that the right to counsel may be invoked by a third-party attempt made in the defendant's presence. Id. The court in Lee, stated as follows:
A rule allowing third parties to invoke individual constitutional rights is not required by federal case law nor [Mississippi case law]. In our opinion, such a rule would be contrary to the clear implication of both federal and state cases. See, e.g., Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.").
Id.
¶22. Under Lee, for an assertion of the right to counsel to be effective, it must emanate from the suspect, not from a third party. Accordingly, we find that Williams's right to counsel was not invoked by the McFarlands' requests for counsel, notwithstanding that such a request was made in his presence. We now focus our inquiry to determine whether the right to counsel was invoked when Williams, in response to the McFarlands' requests for counsel, remarked "thank you so much for coming and helping me here" and/or "yes ma'am I understand."
¶23. In order to invoke the right to counsel, and thereby the protections of Edwards, "the suspect must unambiguously request counsel." Davis v. United States, 512 U.S. 452, 458-62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (finding defendant's statement, "[m]aybe I should talk to a lawyer," ambiguous and insufficient to invoke the right to counsel). Under Davis, the relevant inquiry is "`whether the accused actually invoked his right to counsel.'" Davis, 512 U.S. at 458, 114 S.Ct. 2350 (quoting Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984)). Discussing the level of clarity required, the Court in Davis instructed that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. at 459, 114 S.Ct. 2350.
¶ 24. In the instant case, we find that Williams did not sufficiently invoke his right to counsel. Using the defendant's statement in Davis as a reference of measure, we conclude that Williams's remarks do not amount to an unambiguous request for counsel. Aside from Williams's claim to the contrary, the weight of the evidence adduced at the suppression hearing established that at no point did Williams make reference to an attorney or clearly articulate a desire for an attorney's assistance. Where, as here, a statement is admitted on conflicting evidence, the trial court's decision will generally be affirmed on appeal. Sanders v. State, 801 So.2d 694, 701 (¶26) (Miss.2001) (citing Dancer v. State, 721 So.2d 583, 587(¶18) (Miss.1998)).
¶25. As neither the McFarlands' requests for counsel nor Williams's conduct were sufficient to invoke his Fifth Amendment right to counsel, we find no error in the trial judge's denial of Williams's motion to suppress the confession. This issue is without merit.

II. Whether the trial court erred in failing to require the prosecution to call Officer Dexter Johnson and Officer Kevin Ainsworth at the suppression hearing.
¶26. Williams claims that the trial court committed a violation of Agee v. State, 185 So.2d 671, 673 (Miss.1966) by failing to require the State to offer the testimony of Officer Johnson and Officer *816 Ainsworth at the suppression hearing. We disagree.
¶27. When a defendant claims that a confession was obtained through coercion, the trial court must conduct a hearing, outside the jury's presence, to determine the confession's admissibility. Wilson v. State, 936 So.2d 357, 362 (¶9) (Miss.2006) (citing Thorson v. State, 653 So.2d 876, 888 (Miss.1994)). The court in Agee stated that:
[W]hen, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness.
185 So.2d at 673 (citing Lee v. State, 236 Miss. 716, 721, 112 So.2d 254, 256 (Miss. 1959)).
¶28. Williams would have this Court hold that Agee requires the State to offer the testimony of every officer the parties recall being present at the police station at the time his statement was given. However, we do not find the Agee rule to require as much. Under Agee, "[o]nly those officers claimed to have induced a confession by some means of coercion are required to testify at the hearing." Wilson, 936 So.2d at 362 (¶10) (citing Abram v. State, 606 So.2d 1015, 1030 (Miss.1992)); see also Brink v. State, 888 So.2d 437, 443 (¶9) (Miss.Ct.App.2004) (Agee only requires the State to offer testimony of "persons who are claimed to have induced the confession through some means of coercion.").
¶29. We find that the trial court's failure to require the State to offer the testimony of Officers Johnson and Ainsworth at the suppression hearing did not amount to an Agee violation. Williams's allegations of coercion were directed toward Officers Baily, Tate, and Daniels. Williams did not assert that Officer Johnson or Officer Ainsworth threatened or coerced him, nor does the record indicate that either officer was present when the coercive tactics were alleged to have occurred. Likewise, it was neither alleged, nor does the record reflect that either officer was present when Williams signed the second waiver and gave the confession. Accordingly, we find the trial court did not err in ruling that the State was not required to offer either the testimony of Officer Johnson or Officer Ainsworth. This issue is without merit.

III. Whether the trial court erred in prohibiting the defense from using extrinsic evidence of a prior inconsistent statement to impeach Adam White.
¶30. We review the admission or exclusion of evidence under the abuse of discretion standard of review. Hodgin v. State, 964 So.2d 492, 496 (¶10) (Miss.2007) (citation omitted). Pursuant to Mississippi Rule of Evidence 103, a decision to admit or exclude evidence is not error "unless a substantial right of the party is affected."
¶31. Several days before trial, counsel for Williams interviewed White and transcribed the conversation. During White's cross-examination, the following exchange took place regarding a conversation between White and Officer Davis that occurred while White was leading police to the bodies:
Q. What did Detective Davis say to you while you were riding around?
A. He didn't really say anything. I was asking him questions about what were the possibilities, what could happen with all this. He was explaining the *817 different levels of the charge. And he said the best thing I could do for myself is to give as much information as I can without lying and tell the truth.
Q. Did he tell you if you cooperate, you'd get leniency?
A. No.
Q. He didn't say that to you?
A. No, sir.
¶32. At this point, counsel for Williams sought to impeach White's testimony with the following portion of the transcript of the interview conducted a few days earlier:
Q. Did [Detective Davis] say if you cooperated that there was more of a likelihood that you would receive a lesser charge?
A. He said that if I cooperated that it would help me, he didn't say how it would help me, he said that it would help me. This was after I had started cooperating.
The trial court ruled that defense counsel could ask White about the statement, but the court denied counsel's request to use the transcript.
¶33. As argued by the State, before extrinsic evidence may be used to impeach a witness under Mississippi Rule of Evidence 613(b), "there must be an actual contradiction in fact between the testimony and the prior statement." Everett v. State, 835 So.2d 118, 122 (¶11) (Miss.Ct.App. 2003) (citing Ratcliff v. State, 752 So.2d 435, 439(¶17) (Miss.Ct.App.1999)). A prior statement is inconsistent if "under any rational theory its introduction might lead to a conclusion different from the witness's testimony" or the statement "has a reasonable tendency to discredit the witness's testimony." Everett, 835 So.2d at 122 (¶11) (citing Ratcliff, 752 So.2d at 439 (¶18)).
¶34. In the instant case, Williams fails to demonstrate how White's prior statement is inconsistent with his trial testimony. The transcript of the interview was sought to impeach White's trial testimony that he was not promised leniency. However, White did not represent that he was promised leniency in either statement. White's prior statement, while not identical to his trial testimony, cannot be said to possess a reasonable tendency to discredit his testimony. Therefore, we find that the trial judge did not abuse her discretion in prohibiting defense counsel from using the transcript of the interview. This issue is without merit.

IV. Whether the trial court erred in limiting the defendant's cross-examination of Adam White.
¶35. Under this issue, Williams assigns as error the trial judge's refusal to allow his attorney to (1) cross-examine White using his juvenile court records, (2) introduce Cynthia's bank statement and pictures of White at an ATM, and (3) have White and Williams stand next to each other in order to show that White was larger.
¶36. We review the exclusion of evidence under the abuse of discretion standard of review. Hobgood v. State, 926 So.2d 847, 852 (¶11) (Miss.2006) (citing Clark v. State, 891 So.2d 136, 139 (¶11) (Miss.2004)).
¶37. A criminal defendant is entitled to conduct "broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness." Suan v. State, 511 So.2d 144, 148 (Miss.1987) (citations omitted). However, this right is not absolute; rather, the scope of cross-examination "is within the sound discretion of the trial court and the trial court, possesses inherent power to limit cross-examination to relevant matters." Smith v. State, 733 So.2d 793, 801 (¶37) (Miss.1999) (citing *818 Pace v. State, 473 So.2d 167, 169 (Miss. 1985)).

1. White's youth court record.
¶38. At trial, Williams's counsel sought to cross-examine White using his youth court record (1) to impeach White's trial testimony that he stood 5' 8" and weighed 180 pounds at the time of the murders; (2) to show that White had been institutionalized in the state mental hospital at Whitfield twice for physical violence, once in 1999 and again in 2000; and (3) to show that White had been diagnosed with several mental illnesses, including intermittent explosive disorder. The trial judge refused to allow counsel for Williams to cross-examine White with his youth court record for the purposes offered.
¶39. In the instant case, we find that White's youth court record was not admissible for the purposes for which it was offered. One accused of a crime has the right to cross-examine a witness against him to show bias or interest in testifying. Bass v. State, 597 So.2d 182, 187-89 (Miss.1992) (citing Davis v. Alaska, 415 U.S. 308, 318-19, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). A juvenile court adjudication may, in the trial judge's discretion, be used to cross-examine a witness, other than a criminal defendant, to show bias or interest. See Bass, 597 So.2d at 187-89; Ramsey v. State, 959 So.2d 15, 28 (¶42) (Miss.Ct.App.2006). However, juvenile adjudications cannot be used for general impeachment purposes. See Brown v. State, 749 So.2d 204, 213(¶21) (Miss.Ct. App.1999) (citing Bass, 597 So.2d at 188-89).
¶40. We find that White's juvenile court record was offered for general impeachment purposes, not to show bias or interest in testifying. Evidence of White's height and weight, as represented in his juvenile record was offered to impeach White's trial testimony that he was 5' 8" tall and weighed 180 pounds at the time of the murders. Likewise, evidence that White had twice been institutionalized for physical violence was not offered to show bias or interest in testifying. Instead, it was offered to establish that White had been violent on prior occasions.[2] Regarding evidence that White had been diagnosed with intermittent explosive disorder, this evidence was offered to establish that White has a propensity for violence.[3]
¶41. We find no indication in the record that White's juvenile court records were offered to show bias or interest. Therefore, we find that the trial judge acted within her discretion in ruling that White could not be cross-examined by his juvenile court record. This issue is without merit.

2. Cynthia's bank statement and pictures of White at an ATM.
¶42. During cross-examination, White admitted that, after the killings, he used Cynthia's ATM card to make several withdrawals from her account. White testified that he made several withdrawals with Williams, and he made several after Williams was incarcerated. White could not recall the exact amount withdrawn or *819 the exact number of withdrawals he made. When asked if the amount withdrawn could have been $800, White stated, "Soundsit's a pretty good number." Counsel for Williams then proffered Cynthia's bank statements, as well as photographs depicting White withdrawing money from Cynthia's bank. The trial judge denied the proffer finding the exhibits irrelevant because White admitted withdrawing money, and the bank statements did not show who withdrew money from Cynthia's account. The trial judge held that the exact amount withdrawn was irrelevant.
¶43. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." M.R.E. 401. "Evidence which is not relevant is not admissible." M.R.E. 402. White admitted that he used Cynthia's ATM card on several occasions to withdraw money. While White's use of Cynthia's card does possess a tendency to establish a motive or intent for his involvement in the killings, the exact number of withdrawals and/or the exact amount of money actually withdrawn by White is not a fact of consequence to the determination of the case. Even if determined relevant, this evidence would properly be excluded under Mississippi Rule of Evidence 403 as "its probative value is substantially outweighed by... considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
¶44. Accordingly, we find the trial judge did not abuse her discretion in excluding the bank statements and photographs. This issue is without merit.

3. In-court size comparison.
¶45. As stated above, Williams's theory of the case was that he did not shoot James Jr. or Cynthia, and he was forced to help White destroy the evidence because White threatened to kill him if he did not. To support this position, the defense also stressed that White was much larger in stature than Williams. At the time of trial, Williams testified that he stood 5' 7" and weighed 140 pounds; White testified that he stood 6' 0" tall and weighed 220 pounds. During White's cross-examination, counsel for Williams asked the court if White could stand next to Williams for a size comparison. The trial judge refused the request.
¶46. Given our standard of review, we find that the trial judge did not abuse her discretion in refusing to allow an in-court size comparison. At the time of the murders, Williams and White were both adolescents, age seventeen and fifteen, respectively. The trial was held over two years later. Thus, Williams's and White's sizes at the time of trial can hardly be considered probative of their respective sizes at the time of the murders. In fact, White testified that he had grown four inches and gained some forty pounds since the murders. Moreover, Williams testified that White threatened him at gunpoint. In such a situation, a size difference is virtually a non-factor. This issue is without merit.

V. Whether the trial court erred in requiring the defense to conduct direct examination of Adam White during the prosecution's case-in-chief.
¶47. On the fourth day of trial, the State called White as its final witness. During cross-examination, counsel for Williams asked whether White was under subpoena because the defense intended to call White to testify as part of its case-in-chief. The trial judge ruled that any direct examination of White must be conducted *820 at the conclusion of the State's case-in-chief because "[w]hen he leaves the stand for all practical purposes, he's going to be released by this Court." After the State's redirect examination of White, the trial judge asked counsel for Williams if he wished to conduct any direct examination; he declined the invitation.
¶48. Williams argues that the trial judge's ruling violated his Sixth Amendment right to compulsory process. Morris v. State, 927 So.2d 744, 747 (¶7) (Miss. 2006). The State asserts that the trial judge acted within her discretion in controlling the mode and order of the presentation of evidence under Mississippi Rule of Evidence 611(a).
¶49. We find that Williams's Sixth Amendment right to compulsory process was not violated. White was present and testified at trial. Williams's attorney thoroughly cross-examined White, and he had the opportunity to conduct direct examination if he so desired.
¶50. As the State contends, the essence of this issue involves the trial court's right to control the presentation of evidence under Mississippi Rule of Evidence 611(a), which provides:

Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect the witnesses from harassment or undue embarrassment.
Under Rule 611(a), "it is within the trial court's discretion to decide whether to allow a witness to be recalled to the stand." Ellis v. State, 661 So.2d 177, 179 (Miss. 1995) (finding no abuse of discretion in the trial court's decision to allow the prosecution to recall a witness in order to admit cocaine into evidence).
¶51. In the instant case, we find no error in the trial court's decision not to allow White to be recalled. As previously noted, White was called to testify on the fourth day of trial as the State's final witness. Clearly, the trial judge's decision was made in the interest of efficiency as contemplated by Rule 611(a)(2). We cannot say that the trial judge abused her discretion in so ruling. This issue is without merit.

VI. Whether the trial court erred in refusing a jury instruction on accessory after the fact.
¶52. Williams requested a jury instruction on accessory after the fact. The trial judge denied the instruction noting that Williams was not indicted for accessory after the fact and that it was not a lesser-included offense to murder. Williams argues that the trial judge erred in refusing the instruction. He claims that his testimony provided an evidentiary basis to support the instruction.
¶53. A defendant is entitled to have his or her theory of the case presented to the jury. White v. State, 842 So.2d 565, 575 (¶30) (Miss.2003). A lesser-included offense instruction should be given only where the evidence supports the instruction. Reynolds v. State, 658 So.2d 852, 855-56 (Miss.1995). A lesser-related offense instruction should be granted unless the trial judge can say, taking the evidence in the light most favorably to the accused, that no reasonable jury could find the defendant guilty of the lesser-related offense. Ellis v. State, 778 So.2d 114, 118 (¶15) (Miss.2000) (citing Giles v. State, 650 So.2d 846, 854 (Miss. 1995)); see also Monroe v. State, 515 So.2d 860, 863 (Miss.1987) (a lesser-included instruction should be given where the evidence is such that a reasonable jury "could *821 find the defendant not guilty of the principal offense charged in the indictment, yet guilty of the lesser-included offense.") (citations omitted).
¶54. One is an accessory after the fact when he or she has "concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that such person had committed a felony, with intent to enable such felon to escape or to avoid arrest, trial, conviction or punishment, after the commission of such felony...." Miss.Code Ann. § 97-1-5 (Rev.2006).
¶55. In the instant case, we find that the evidence was such that no reasonable jury could find Williams not guilty of murder, yet guilty of accessory after the fact. Williams's confession and White's testimony overwhelmingly refute any suggestion that Williams acted only as an accessory after the fact. In his confession, Williams admitted that he killed James Jr. and Cynthia. Thus, by his own admission, corroborated by White's testimony, Williams was a principal to the crime of murder. Therefore, he could not, at the same time, be an accessory after the fact. See, e.g., Byrom v. State, 863 So.2d 836, 875-76 (¶¶137-38) (Miss.2003); Mangum v. State, 762 So.2d 337, 343(16) (Miss.2000); Hoops v. State, 681 So.2d 521, 534 (Miss.1996); Buckley v. State, 511 So.2d 1354, 1358 (Miss.1987).
¶56. Furthermore, the only evidence in the record which supports an instruction on accessory after the fact was the testimony of Williams himself. However, Williams's own testimony contradicts his assertion that he was entitled to an instruction on accessory after the fact. While Williams admitted helping White dispose of the bodies and clean the scene, he maintained throughout his testimony that he did so under duress because White threatened to kill him at gunpoint if he did not. Therefore, according to Williams, he was not guilty of anything.
¶57. We find no evidence in the record to support Williams's request for an instruction on accessory after the fact. This issue is without merit.

VII. Whether Williams is entitled to a new trial based on cumulative error.
¶58. We have found no error in Williams's individual assignments of error. Consequently, there can be no cumulative error. This issue is without merit.
¶59. THE JUDGMENT OF THE CIRCUIT COURT FOR THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY OF CONVICTION OF TWO COUNTS OF MURDER AND SENTENCE OF TWO CONCURRENT TERMS OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] White was charged with accessory after the fact.
[2] Further, White's prior instances of violence are inadmissible under Mississippi Rule of Evidence 608(b), which prohibits extrinsic evidence of specific instances of conduct, not probative of veracity, from being used to attack the credibility of a witness.
[3] We find this evidence also inadmissible under Mississippi Rule of Evidence 404(a) as the evidence was offered to show that White was a violent person and, therefore, create an inference that he acted in conformity with his propensity for violence on the night in question.